**ABBOTT REDMONT THINLITE CORPORATION, Plaintiff-Appellant,**

v.

**Rudolph R. REDMONT and Circle Redmont Corporation, Defendants-Appellees.**

**No. 338, Docket 71-1565.**

United States Court of Appeals, Second Circuit.

Argued Jan. 16, 1973.

Decided March 13, 1973.

Jerrold Morgulas, New York City (M. Carl Levine, Morgulas & Foreman, New York City, of counsel), for plaintiff-appellant.

David F. Dobbins, New York City (Royall, Koegel & Wells, New York City, of counsel), for defendants-appellees.

Before FRIENDLY, Chief Judge, and OAKES and TIMBERS, Circuit Judges.

OAKES, Circuit Judge:

The issue here presented is whether the appellees, Rudolph R. Redmont and Circle Redmont Corporation, deprived the appellant, Abbott Redmont Thinlite Corporation, of a business opportunity in which it had a "tangible expectancy," and thereby violated Redmont's obligations as a former officer-employee of appellant. Burg v. Horn, 380 F.2d 897, 899 (2d Cir. 1967); Blaustein v. Pan American Petroleum & Transport Co., 293 N.Y. 281, 300, 56 N.E.2d 705, 713–14 (1944); Guth v. Loft, Inc., 23 Del. Ch. 255, 270–71, 5 A.2d 503, 510–11 (Sup.Ct. 1939); see I. Hornstein, Corporation Law and Practices § 441. This court's jurisdiction rests on diversity of citizenship. 28 U.S.C. § 1332. The opinion below is reported at 324 F.Supp. 965 (S.D.N.Y.1971).

Appellee Redmont, who had previously worked in the glass block business, joined appellant Abbott in 1960 as president of Abbott Redmont Thinlite Corpo-

ration. Abbott Redmont's business consisted of furnishing and installing glass block skylights, including toplights (glass blocks set in aluminum grids, generally used in schools) and rooflights (glass blocks set in anti-corrosive concrete grids, generally used in sewage plants). The method used to sell these lights was to discover through trade journals and other sources what construction projects were in the course of design. Once aware of this, Abbott would contact the architect who was in the process of working up the designs for those projects, and attempt to convince him to write into the design the use of skylights and other specifications which Abbott's products line would fulfill. Part of appellee Redmont's job was to contact such architects and to convince them of the advisability of employing Abbott's products in their final design. As of the time in question, up to and including the date when Redmont quit his employ with Abbott and began his own company, Circle Redmont Corporation (Circle), Abbott was the sole distributor in the metropolitan New York area for the particular products with which this action is concerned. Therefore, once the proper requirements were, or named product was, written into the architect's specifications, to all intents and purposes Abbott was assured of the required subcontract. Once Abbott's products had been incorporated into the plans and specifications by the architect, the projects were then in the regular course put out for bid to general contractors. When the general contractor was chosen Abbott would enter into a formal subcontract with the general contractor to furnish and install the Abbott product.

There are five projects here involved.[1] Appellee Redmont, while in the employ of Abbott, had proceeded to contact the architects for each of these five projects and to write Abbott product specifications into each of the projects. In each case Redmont had also prepared a bid for submission to the general contractor who had been successful in obtaining the general construction contract (or the owner himself if the owner chose to build without a general contractor). Redmont concededly retained knowledge of the amounts of the bids which he had prepared while in Abbott's employ after his employment ceased.

In early 1966 Owens-Illinois, the producer of the glass block used in all of Abbott's products, announced that it was discontinuing the production of glass block. Soon afterward, in February, 1966, Products Research Corporation (PRC), which made the aluminum grids for the toplights and inserted the Owens-Illinois glass block in the grids and from which Abbott purchased the complete toplight sections,[2] informed Abbott that as a result of Owens-Illinois' action, it was leaving the glass block business.

In March, 1966, George Abrams, executive vice president of Abbott, told Redmont that if he wanted to stay with Abbott he would have to take a cut in salary. As an alternative Abrams offered Redmont the opportunity of buying Abbott's rooflight inventory at cost and going into business for himself. Redmont and Abrams entered into a series of negotiations concerning (1) the possibility of an agreement whereby Redmont would purchase appellant's rooflight inventory; and (2) the possibility that Redmont would assume all of appellant's outstanding skylight contracts and share the profits. None of Abbott's proposals were acceptable to Redmont and he left Abbott on April 1, 1966.

Meanwhile Abbott had put in protective orders with PRC for the four top-

| 1. | Job | Type |
|----|-----|------|
| | Plainfield Library | Toplight |
| | Oakland High School | Toplight |
| | Junior High School 144 | Toplight |
| | Riverdale Girls School | Toplight |
| | Manhattan Pumping Station | Rooflight |

2. For "rooflight" jobs, Abbott bought its own glass block directly from Owens-Illinois.

light jobs as to which it now seeks an accounting. On May 18, 1966, however, PRC sent a letter to Abbott referring to these and other orders from Abbott "which we have not entered because we have received no shop drawings," and advising Abbott that a failure to receive shop drawings by June 6, 1966, would result in a cancellation of the orders. There is no evidence that Abbott ever found another supplier of either rooflights or toplights after June 7, 1966, or that it furnished shop drawings to PRC by the deadline date of June 6, 1966.

Redmont, meanwhile, had established his own company, Circle, and had found another source of supply for rooflights and toplights. On the dates given below, Redmont, acting by and for Circle, entered into contracts for toplight and rooflight work on projects for which he had persuaded the architects to write in Abbott product specifications while working for Abbott:

| Job | Date of Redmont's Contract |
| --- | --- |
| Plainfield Public Library | 4/18/66 |
| Oakland High School | 6/ 2/66 |
| Junior High School 144 | 7/20/66 |
| Riverdale Girls School | 8/ 5/66 |
| Manhattan Pumping Station | 8/ 5/66 |

■ As stated, the central questions for determination here are whether Abbott Redmont Thinlite Corporation had a "tangible expectancy," Burg v. Horn, supra, 380 F.2d at 899, in the five contracts listed above and whether Redmont violated his fiduciary duty by di-

verting that expectancy to his own profit.[3] Although Redmont had left the employ of Abbott at the time he contracted with the general contractors for these projects, he was taking advantage of a corporate opportunity which he had helped obtain for Abbott and which would have almost certainly been Abbott's but for Redmont's departure. Redmont, we believe, had an obligation which carried over after he left Abbott not to exploit projects which would have clearly brought profits to Abbott but for his competition. Cf. Guth v. Loft, Inc., supra; Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (Cardozo, J.) (joint venturers). S. W. Scott & Co. v. Scott, 186 App.Div. 518, 174 N. Y.S. 583 (1919), relied on by the court below for its conclusion to the contrary, dealt with insurance underwriting and soliciting, a highly competitive business and one in which "expectancies" were hardly "tangible." Here, on the other hand, until Redmont went into business there was no competition and once Abbott's specifications were written into the architect's plans it was almost a certainty that Abbott would get the final subcontract to install its lights. While occasionally the architect's specifications would be changed, the record shows that this happened very rarely. Thus, it was not merely an "expectancy," but almost a certainty that Redmont's work on these five deals would secure the final contract for Abbott. In Scott the employee took no business from his employ-

3. Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders. . . . . The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated . . . .

If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit . . . .

The rule, referred to briefly as the rule of corporate opportunity, is merely one of the manifestations of the general rule that demands of an officer or director the utmost good faith in his relation to the corporation which he represents.

Guth v. Loft, Inc., 23 Del.Ch. 255, 270–71, 5 A.2d 503, 510 (Sup.Ct.1939).

er which would not likely have been won away by some other underwriter once the employee departed. Redmont did take business which, but for his entry into direct competition with Abbott, would have been Abbott's if Redmont had not departed. Concededly, this difference in degree of likelihood of realizing income diverted by the alleged fiduciary resulted from the difference in the market structure here and that in *Scott*.

■ The degree of likelihood of realization from the opportunity is, however, the key to whether an expectancy is tangible. A Massachusetts opinion with which we agree, and believe New York courts would agree if presented with the issue, American Window Cleaning Co. v. Cohen, 343 Mass. 195, 201, 178 N.E.2d 5, 9 (1961), bears this out in holding that knowledge that a pre-contract relationship between an employer and an irregular customer was likely to ripen into contract was "special corporation information" and cannot be exploited by an ex-officer of the corporation.

■ The high degree of likelihood that, but for Redmont's competition, Abbott would have been awarded these contracts is combined here with the fact that Redmont benefited by information as a result of his employment at Abbott —knowledge of the details of the specifications, knowledge of the contractor's requirements, knowledge of Abbott's probable costs—which made Abbott peculiarly vulnerable to his competition on the specific deals here in question. While this is not the kind of information that, like customers' lists, is "confidential" in the sense of the term that might in and of itself create liability on use, Restatement, Agency (Second) § 396(b) and Comment (1958), it was information obtained in the course of his employment. A former employee may, of course, go into competition with his ex-employer and can use general information concerning the method of business and names of customers of his ex-employer in his new venture. *Id.* But he cannot, as here, utilize specific information he obtained during his employment to deprive his ex-employer of customers with whom he knows a deal is in the process of completion.[4] The use of specific information on deals in progress obtained while in Abbott's employ, and the *degree of likelihood* that but for Redmont's competition Abbott would have been awarded the contract, dictate our holding that Redmont violated his fiduciary obligations to Abbott by submitting competing bids.

■ But Abbott had a "tangible expectancy" in the four toplight contracts only until June 7, 1966, when PRC cancelled Abbott's toplight orders, leaving Abbott without a source of supply. Abbott had ample warning from PRC that these orders would be cancelled if Abbott did not submit shop drawings to PRC by June 6, 1966. Abbott's failure to submit the requested drawings constitutes intentional abandonment, cf. International News Service v. Associated Press, 248 U.S. 215, 240, 39 S.Ct. 68, 63 L.Ed. 211 (1918); Foulke v. New York Consolidated Railroad Co., 228 N.Y. 269, 273, 127 N.E. 237, 238 (1920), of its contract rights in the toplight projects on which contracts were signed after that, *i.e.*, the Junior High School 144 project and the Riverdale Girls School project. It is not clear from the record how long Abbott retained its supply of glass blocks for rooflights for the Manhattan Pumping Station, the one rooflight project after Owens-Illinois went out of the glass block business. Absent any such supply, Abbott cannot complain of any loss by misappropriation of its "opportunity" since it would have abandoned the opportunity in any event. On this the record is not clear.

We reverse as to the Plainfield Public Library and Oakland High School proj-

4. The dictum in Duane Jones Co. v. Burke, 306 N.Y. 172, 189, 117 N.E.2d 237, 245 (1954), which suggests the defendants there would not have been liable had they waited to compete until after they left Duane Jones Co. is not to the contrary. In fact the defendants there had not waited to compete until they left the company. Nothing in the opinion deals with the question what the rule of law would be had this factual showing of pre-separation competition not been made.

ects, affirm as to the Junior High School 144 and Riverdale Girls School projects, and remand for further findings in respect to the Manhattan Pumping Station project and for the award of damages in accordance with this opinion.