William O'DONNEL,
Plaintiff-Counterdefendant,

v.

MARINE REPAIR SERVICES, INC.,
Defendant-Counterplaintiff,

and

Vincent Marino, Anthony Juliano and Samuel N. Greenspoon, Defendants.

No. 80 Civ. 4121(MEL).

United States District Court,
S. D. New York.

Jan. 21, 1982.

Richard Bennett Cooper, P. C., New York City, for plaintiff-counterdefendant; Richard B. Cooper, Elizabeth M. Toll, New York City, of counsel.

Patterson, Belknap, Webb & Tyler, New York City, for defendants; Frederick T. Davis, Zachary W. Carter, Susan U. Douglass, New York City, of counsel.

LASKER, District Judge.

William O'Donnel, the owner of 35% of the shares of stock and a former director and officer of Marine Repair Services, Inc. ("MRS"), sues for dissolution of the corporation under New York Business Corporation Law § 1104(a) on the grounds that those in control of MRS are guilty of illegal, fraudulent or oppressive acts towards O'Donnel and that the assets of the corporation are being looted or wasted. O'Donnel also sues on the corporation's behalf to recover allegedly wasted or looted assets. Defendants counterclaim that O'Donnel breached his fiduciary duties to the corporation by competing with MRS during and after his employment as an officer and that O'Donnel failed to return company cars after the termination of his employment. The case has been tried to the court.

According to O'Donnel's evidence, he and Marino agreed that they would share an equal voice and equal benefits in MRS, but Marino began refusing O'Donnel a say in the corporate management in April, 1980, and eventually brought about his termination as a director and officer in May and June, 1980. O'Donnel testified that he first met Marino about January, 1971, when Marino was hired and began working at Marine Trailers, a container repair concern and a subsidiary of Seamount, where O'Donnel had been employed for approximately two years as President. Sometime in 1972, American Export Lines, Marine Trailers' largest customer, expressed its intention not to continue doing business with Marine Trailers because it was unhappy with its principals. Marino suggested to O'Donnel that they acquire Marine Trailers together and attempt to convince American Export to keep its business there with Marino and O'Donnel owning and managing the company. They agreed that O'Donnel would bring Marino up to his own level of pay and that they would share equally in the venture. American Export, however, wanted nothing to do with anyone but O'Donnel and Marino at Marine Trailers, and subsequently cancelled its contract with Marine Trailers. (Tr. 18–21). American Export, however, indicated to Marino that if he could form a company which was properly licensed it would send its business to him. Marino next suggested that he attempt to purchase a small, licensed container repair business from his cousin, Philip Lacqua. According to O'Donnel, he and Marino negotiated with Lacqua and it was agreed that Lacqua would sell Marino 85 of the shares and retain 15, and that Marino would then sell O'Donnel 30 of his 85 shares. O'Donnel testified that it was agreed that the two would have equal ownership but that Marino would hold an extra 25 shares for the benefit of certain persons in Brooklyn. It was also agreed that their salaries and benefits would be equal and

that they would each have an equal voice in the management of the new corporation. (Tr. at 21–28). It was not until 1974 that Marino and O'Donnel received formal certificates of stock ownership and that O'Donnel formally became a director and officer. (Tr. at 111, 112).

From 1974 to 1980, the salaries and perquisites of Marino and O'Donnel were equal. During this period, the company prospered. While they began with an initial investment of only $12,000. or so, by 1980 Marino and O'Donnel were each earning approximately $150,000. per year, not including significant fringe benefits such as use of company cars, discretionary use of expense accounts, and various company paid insurance benefits. According to O'Donnel, he had primary responsibility for the financial affairs of the company, including setting and keeping up the books and records and the like, and Marino was primarily responsible for the day-to-day operations in the New York port. Important decisions were arrived at by consensus. (Tr. at 28–29). In 1974, the company expanded its operations to southern ports, over which O'Donnel had primary responsibility for day-to-day operations. Eventually, the corporation owned container repair facilities in Baltimore, Maryland; Norfolk, Virginia; Charleston, South Carolina; Houston, Texas; Savannah, Georgia; and Pireus, Greece. Subsidiaries were set up to own all the non-New York facilities except those at Norfolk. By the last months of his employment at MRS, O'Donnel was spending about 90% of his time outside of New York, overseeing the business of the southern subsidiaries. In 1977, the corporation acquired Lacqua's shares, leaving Marino with 55 shares and O'Donnel with 30. (Tr. at 26–30).

Sometime in 1977, the FBI interviewed O'Donnel and Marino in connection with its investigation into East Coast waterfront activities and subpoenaed them and their corporate records before a grand jury. O'Donnel and Marino, for themselves and on behalf of MRS, consulted Samuel Greenspoon, Esq., who began to represent them as attorney in connection with the investigation.

Eventually, Greenspoon became general counsel for the corporation (Tr. at 30–33).

In January, 1979, Marino was indicted for an alleged kickback scheme. It was charged that he had agreed to pay money to two executives of a steamship company and a union official for each chassis repaired by MRS. O'Donnel testified that in the winter or spring of 1979, he became increasingly concerned that the criminal investigation was taking up the bulk of his time and energy and subjecting him to great stress. He decided that he wanted to separate himself from the New York operation and proposed to Marino that Marino buy out his interest in MRS in exchange for O'Donnel taking some of the southern subsidiaries. Marino told O'Donnel that he would consider the proposal. Approximately one month later, O'Donnel refined his proposal, offering Marino full ownership of the New York and Norfolk operations and to repay the $600,000. intercorporate debt owed by the subsidiaries to the parent in exchange for ownership of the other southern operations. Again Marino stated that he would consider the proposal. In the summer of 1979, O'Donnel made a third proposal that would have left Marino with the New York, Norfolk and the highly profitable Baltimore operation, and would have involved adjustment of the intercorporate debt in relation to their respective stock holdings. A few days later, Marino told O'Donnel that he would not accept the proposals because he felt that the subsidiaries and the parent were interdependent and could not effectively be split. Marino offered to buy O'Donnel out and asked O'Donnel to name a price for his interest. O'Donnel agreed to consider Marino's proposal. In subsequent conversations with Greenspoon, O'Donnel stated that he could not accept Marino's proposal because a cash buy-out would present tax problems, would not leave him with enough money to live on, and because Marino would insist on a covenant not to compete, just as he had demanded of Lacqua when Lacqua's interest was bought. Greenspoon indicated that he would try to help in the negotiations between Marino

and O'Donnel and asked O'Donnel what he would do if Marino were convicted. O'Donnel told him that without question he would remain in New York and manage the company until Marino's legal problems were concluded. (Tr. at 35–42). Up to this point, the negotiations had apparently not adversely affected the relationship between Marino and O'Donnel which continued on a close and harmonious basis. (Tr. at 35–42; 238–39; 1038–39).

Negotiations continued through the fall of 1979 and into the spring of 1980. Several times during the discussions, O'Donnel conceded, he told Greenspoon and Marino that Marino's proposal was unacceptable and that he would prefer to take nothing from MRS and begin his own business in the localities with which he was familiar rather than sign a covenant not to compete. According to O'Donnel, neither Greenspoon nor Marino appeared to take these statements seriously. Indeed, according to O'Donnel, Greenspoon assured him that they would not let him walk away with nothing. (Tr. at 40–42; 271). O'Donnel testified that, despite these statements, he took no action to start his own business until after his employment with MRS was terminated. (Tr. at 80–84).

During the negotiation period, both were indicted in December, 1979, for conspiracy and for aiding the embezzlement of funds of a common carrier. This indictment replaced the earlier charge against Marino and not surprisingly increased O'Donnel's fears about his relationship with Marino and the New York waterfront business. (Tr. at 32). Their trial began on March 10, 1980, and concluded on April 2, 1980. On Greenspoon's advice, O'Donnel distanced himself from Marino while in the courthouse. Marino was convicted and the jury was unable to reach a decision as to O'Donnel. O'Donnel's indictment was eventually *nolle prossed.*

O'Donnel testified that after the trial he noticed a cooling of the relationship between himself and Marino. For example, when he offered to run the company while Marino dealt with his legal problems, Mari-

no told him that he no longer trusted O'Donnel. (Tr. at 62). In addition, according to O'Donnel, Marino began to leave O'Donnel out of the major decision making facing the company. After the trial, O'Donnel noticed one Larry Bonaguidi on the premises of the company and learned that Marino had proposed a sale of the New York operation to Bonaguidi's group without consulting O'Donnel. (Tr. at 52–55). In addition, O'Donnel stated that conversations between himself and Marino became infrequent; he was excluded from day-to-day decisions relating to the company; equipment was sold without his knowledge; he was no longer consulted as to the employment of office personnel; employees were directed by Marino not to speak to him about the business; and at Marino's instruction, he no longer received the vital sales information from the managers of the subsidiaries. (Tr. at 61–64).

About May 3rd, Greenspoon called O'Donnel and told him to be sure to be in New York on May 20th. The same day, Greenspoon prepared and sent a handwritten notice of a shareholders' meeting to be held May 20th. At the shareholders' meeting, Marino voted O'Donnel out as a director and Greenspoon, Marino and Anthony Juliano were elected directors. (Tr. at 64–68). At the meeting, O'Donnel voiced his objection to his termination and to the proposed sale of the New York operations. He stated that he had already been closed out of the company for several weeks. A meeting of the new board followed the shareholders' meeting, at which a resolution was adopted requiring all officers to obtain Marino's written approval for any travel. This action impacted most heavily on O'Donnel, who at the time spent approximately 50% of his time traveling. (Tr. at 68).

On May 22, 1980, Marino was sentenced to a prison term of a year and a day. On May 23, 1980, O'Donnel began a two week vacation and, as had been his and Marino's practice, wrote himself a check for two weeks pay in advance. He noted in the ledger that the pay was for the period ending June 1, 1980. On May 27th, O'Don-

nel wrote to the Waterfront Commission to give legally required notice of the changes in MRS management. He also noted that a minority shareholder had objected.

After O'Donnel was removed as a director but before he was terminated as an officer, he spoke with Edward Yager, the manager of Container Maintenance ("CM"), the Charleston subsidiary, who called O'Donnel to express concern about the future of the company. (Tr. at 80–82). In his deposition testimony, Yager stated that he had noticed after the criminal trial that relations were not good between O'Donnel and Marino (Yager Dep. at 31–34) and that Marino, who rarely called CM and had only visited it once, suddenly began expressing concern for Yager. (*Id.* at 40–41). When O'Donnel told Yager that O'Donnel had been removed as a director and was trying to negotiate a separation with Marino, Yager said that he "blew up" and wondered what he was supposed to do because "my kingdom is falling down around me." (*Id.* at 38). O'Donnel told him to stay calm: that everything would be worked out. (*Id.*) O'Donnel made no mention of the possibility of Yager and himself going into business together. (*Id.* at 44). Yager told O'Donnel that if O'Donnel and Marino did separate, Yager would not work for Marino. Yager testified that following this conversation, he remained concerned about his own future in light of the rift between Marino and O'Donnel, and rented space in Charleston for the month of June so that, if Marino and O'Donnel split up, "I would have a place to start a company of my own." (*Id.* at 60–61). Yager asked the broker to keep the rental confidential.

On June 2, 1981, the board met and voted to terminate O'Donnel's position as secretary-treasurer of MRS. Greenspoon notified O'Donnel in writing of the Board's action and that his termination was effective June 8, 1980. (Tr. at 78–79; Ex. C).

Some time after June 6, 1980, O'Donnel called Yager and told him he (O'Donnel) had been fired and would like to talk about starting a business together. (Tr. at 83).

On June 11, 1980, O'Donnel orally applied for a $55,000. loan to go into business in competition with MRS. (Tr. at 85; Merendino Dep. at 34, 37, 46).[1] On June 12th or 13th, O'Donnel met in Charleston with Yager. They agreed to join forces to commence a container repair business of their own in Charleston. (Tr. at 87–90). O'Donnel told Yager that his lawyers had warned against soliciting business or employees while Yager was still employed at CM. (Tr. at 88). On June 13, 1980, Yager submitted two weeks notice of his resignation to Marino. While Yager finished his work at CM, O'Donnel began preparing for the opening of his and Yager's new company, General Container Services ("GCS"), at the location which Yager had rented. During this period Yager worked some evenings with O'Donnel, planning the company's future. On June 27th, Yager ceased his employment at the MRS subsidiary and the next day began working full time at GCS. Between June 30th and July 3rd, three more employees gave notice that they were quitting CM, and a fourth gave notice on July 9th. These four eventually joined GCS. Each testified at deposition that he or she was not solicited at any time before June 27th by Yager or O'Donnel. (Deposition of Robert Knies at 5–6; Lawrence Potter at 10; Mary Morris at 15; Benjamin Parker at 6). In addition, in early July a major customer of CM arranged for certain reefers which CM had been working on to be transferred to the GCS operation. Barbara Anderson, who made the decision, testified at deposition that she did so because she trusted Yager and wanted to ensure that the repairs were made properly. (Deposition of Barbara Anderson at 64–68). GCS has recently begun a container repair business in Baltimore as well.

In September, 1980, the Waterfront Commission instituted proceedings to cancel MRS' waterfront permit on the ground of

---

1. Joseph Merendino is a vice-president of Chemical Bank and the person O'Donnel contacted to apply for the loan.

Marino's conviction. (Ex. 64). Later in September, the New York operation was sold for approximately $1.1 million, a price which plaintiff's expert found unreasonably low in light of the assets of the corporation and its profit of approximately $600,000. per year after taxes. Since O'Donnel's departure, MRS has also invested approximately $173,000. in vacant land in Houston, invested $81,000. and loaned $100,000. to a hardware company, invested $76,000. in an oil well, and spent greater amounts on labor costs and parts in Charleston, Savannah and New York, without raising prices correspondingly. In addition, the corporation has spent substantial amounts on Marino's legal fees but has failed to pay all of O'Donnel's legal fees from the criminal trial, and has continued to pay Marino $150,000. per year and a bonus of $30,000. despite the fact that the New York operation had been sold. O'Donnel contends that these acts have been wasteful or fraudulent and engineered to make it appear that O'Donnel's competition is hurting MRS.

Marino's evidence conflicts with O'Donnel's in several respects. First, as to the development of MRS, Marino testified that he alone negotiated with Lacqua and that, during the first months of MRS' operations, O'Donnel did not participate in the business but remained at Marine Trailers. According to Marino, O'Donnel did not begin working at MRS until August, 1973, and then merely as an employee. Marino testified that in late 1973 or early 1974 he and O'Donnel began discussing the possibility of O'Donnel becoming a minority shareholder of MRS and that, in April, 1974, he sold O'Donnel 30 of his 85 shares and agreed to pay him a salary equal to his own. At that time, Marino testified, O'Donnel was named to the board of directors. (Tr. at 302–16). This version of O'Donnel's initial participation is supported by Greenspoon's testimony as to what O'Donnel told him when he was advising O'Donnel and Marino in regard to the FBI investigation. (Tr. at 782–88).

Marino denied O'Donnel's testimony that they had agreed that they would have equal voice in the management of the company. According to Marino, he maintained operating control of MRS and frequently exercised his prerogative to overrule O'Donnel on major decisions. (Tr. at 322–26).

In addition, Marino testified that the New York operation was sold because of increasing and uncontrollable costs of workman's compensation insurance. Marino and Greenspoon testified that O'Donnel himself had suggested selling New York on the grounds of the insurance expenses and the fact that a critical customer, Farrell Lines, was in precarious financial condition. Greenspoon testified that O'Donnel had suggested $750,000. as the selling price and had argued that the company's future was in the South. (Tr. at 809–15).

According to the testimony of Greenspoon and Marino, O'Donnel was terminated because they believed that he had begun to compete with the corporation and to breach corporate confidences. They testified that during the negotiations on a possible separation, O'Donnel repeatedly threatened to leave MRS and take the subsidiaries with him. He is said by Marino and Greenspoon to have stated that Yager, the important manager in Charleston, was "his man." (Tr. at 349–50; 829). In addition, Marino testified that in early May, O'Donnel advised Marino that O'Donnel would be making a trip to Baltimore, that O'Donnel did not call him during that week, as was the common practice, and that when the manager of Baltimore reported that O'Donnel had in fact never visited there, Marino became suspicious that O'Donnel had begun to make good on his threats. (Tr. at 353–54). Greenspoon testified that he kept O'Donnel abreast of the negotiations regarding the sale of the New York port. In support of the proposition that O'Donnel was fired because of his suspected competition, the defendants introduced the board minutes of the June 2nd meeting at which O'Donnel was removed. They also contend that O'Donnel applied for the loan to compete with MRS on June 2nd, while he was still working for MRS, and note that the date on the financial statement which O'Donnel submitted to the bank is June 2nd. The defendants also maintain, relying on the

temporal proximity of their notices of resignation, that the employees of the Charleston subsidiary were solicited by O'Donnel and Yager prior to the time that Yager's employment ended. They emphasize the admission that Yager worked in the evenings at GCS while employed at the MRS' Charleston subsidiary. The defendants attempt to impugn Anderson's statement that her company was not solicited prior to June 27th on the basis that Anderson was romantically involved with Yager and accordingly must have known of his plans. Finally, the defendants presented evidence to justify the various investments and pricing decisions about which O'Donnel complains and the selling price of the New York operation. They established that O'Donnel's expert did not properly evaluate the New York operation because he did not consider that important assets had been retained, the precariousness of the financial conditioning of a critical client, and the lack of a long term lease at the desirable location which MRS had enjoyed.

## I.

We found O'Donnel to be an exceptionally forthright witness and find entirely credible his description of the circumstances leading up to his termination from MRS. With respect to the beginning of the relationship, the fact that he was Marino's boss prior to their joint endeavor and that his experience in the business was greater supports his testimony that, when MRS was created, it was agreed that O'Donnel and Marino would have equal pay, equal perquisites and benefits, equal voice in the management of the company, and equal ownership. Regardless of the time he formally became a shareholder, we find that he and Marino had agreed that the benefits of, and authority in, the company would be shared equally. The equality of compensation and amenities throughout the years reveals a studied treatment of both Marino and O'Donnel with equal dignity in the corporation.

In addition, we find that O'Donnel was excluded from his role in the corporation beginning at least by April of 1980. O'Donnel's testimony that he first learned of negotiations with Bonaguidi for the sale of the New York operation when he found Bonaguidi on the premises after the trial went largely unchallenged. Defendants' testimony that O'Donnel nevertheless knew of the plans to sell New York because he was the one who had been insisting on such action is neither persuasive nor credible, particularly in view of the fact that the defendants do not dispute that negotiations were taking place as to a separation between Marino and O'Donnel in which O'Donnel had proposed leaving Marino with New York and possibly other operations. Such settlement discussions would have been entirely inconsistent with O'Donnel's purported demands that the New York operation be sold. Moreover, O'Donnel testified that the monthly sales reports were no longer delivered to him during this period, that Marino had instructed employees not to inform him of company business, that Marino had stated that he had lost trust in O'Donnel, and that in fact Marino rarely spoke to him during this time. These largely unchallenged statements are wholly consistent with O'Donnel's testimony that he had not been informed, nor did he support, the sale of the New York operation and that he had indeed been squeezed out of any share in the control of the corporation.

We also find that O'Donnel did not begin to compete with MRS until June 11, 1980, when he applied for a loan to finance a new company and after he had already been removed as a director and officer of MRS. Defendants' emphasis on O'Donnel's statements during negotiations that he could just walk away and take the southern subsidiaries as a justification for terminating O'Donnel is unpersuasive for several reasons. First, defendants themselves suggested that they did not take such statements seriously (Tr. at 953–55; 959), and the retention of O'Donnel and continuing harmonious relationship between O'Donnel and Marino after these statements were purportedly made confirm as much. Second, the fact that O'Donnel suggested that he could go out on his own if the

negotiations failed does not lead to the conclusion that he intended to do so while still employed at MRS, in breach of his fiduciary obligations. Third, Yager's deposition testimony demonstrates O'Donnel's patience and sense of responsibility to the corporation, even after he was removed as a director, in attempting to work out his differences with Marino. As Yager stated, O'Donnel tried to calm and reassure him that a settlement would be negotiated. In addition, defendants' insistence that O'Donnel applied for the bank loan on June 2nd, the date of his financial statement submitted to the bank, is directly contradicted by the deposition testimony of Joseph Merendino, a vice-president of Chemical Bank who took the application, that O'Donnel first applied on June 11, 1980, and that the June 2nd date on the financial statement is the "as of" date. (Merendino Dep. at 34, 37, 46). And the defendants' assertion that Yager and O'Donnel must have conspired for Yager to rent space on June 3rd is pure speculation, contradicted by the testimony of both Yager and O'Donnel and made implausible by the fact that by this time O'Donnel had legal advice which he was apparently heeding. (E.g., Yager Dep. at 69). Finally, we find O'Donnel's testimony credible that he did not furtively take a trip in late May or early April to commence competition with MRS while telling Marino that he was going to Baltimore. (Tr. at 1034–36). We also find, on the basis of the deposition testimony of the relevant employees and customer that no employee or customer was solicited by GCS prior to June 11, 1980.[2]

## II.

O'Donnel contends that he is entitled to dissolution of MRS under New York Business Corporation Law § 1104(a) on the ground that the defendants' expulsion of him from the company, beginning in April, 1980, and culminating in his termination as an officer on June 2nd constituted an "oppressive act" within the meaning of the statute. Since we find this contention dispositive, we do not consider O'Donnel's additional asserted grounds for dissolution.

Section 1104(a), enacted in 1979, provides:

"(a) The holders of twenty percent or more of all outstanding shares of a corporation, other than a corporation registered as an investment company under an act of congress entitled 'Investment Company Act of 1940', no shares of which are listed on a national securities exchange or regularly quoted in an over-the-counter market by one or more members of a national or an affiliated securities association, who are entitled to vote in an election of directors may present a petition of dissolution on one or more of the following grounds:

(1) The directors or those in control of the corporation have been guilty of illegal, fraudulent or oppressive actions toward the complaining shareholders;

(2) The property or assets of the corporation are being looted, wasted, or diverted for non-corporate purposes by its directors, officers or those in control of the corporation.

(b) The court, in determining whether to proceed with involuntary dissolution pursuant to this section, shall take into account:

(1) Whether liquidation of the corporation is the only feasible means whereby

2. Defendants' argument that O'Donnel competed with MRS while employed also rests on the assertion that "Yager and the four other employees who left Container Maintenance ... testified falsely in material respects concerning the critical time periods when initial activities on the part of O'Donnel or his surrogate Yager would have been improper." (Defendants' Post-trial Brief at 42). According to defendants, it is incredible that Yager did not discuss with his roommate or his "paramour", Barbara Anderson, an employee of Sea Containers, his intention to leave Container Maintenance and start a new company. However, Yager testified that he knew that he could not legally discuss with fellow employees or customers his plans to compete until after he left Container Maintenance. The testimony of the employees and a customer of Container Maintenance that they did not know of Yager's plans until after he had left is entirely consistent with Yager's testimony that he heeded this legal knowledge. Nothing supports the defendants' naked speculation that all these witnesses conspired to perjure themselves.

the petitioners may reasonably expect to obtain a fair return on their investment; and

(2) Whether liquidation of the corporation is reasonably necessary for the protection of the rights and interests of any substantial number of shareholders or of the petitioners."

N.Y.B.C.L. § 1104(a). Research indicates only two New York cases interpreting the quite new § 1104(a), *Topper v. Park Sheraton Pharmacy, Inc.*, 107 Misc.2d 25, 433 N.Y.S.2d 359 (1980), and *Matter of Beshar*, N.Y.L.J. (2/18/81) 6, col. 1, aff'd 82 A.D.2d 1021, 440 N.Y.S.2d 803 (1981). Those decisions interpret the statutory term "oppressive actions" to establish a "reasonable expectation" test for dissolution.

In *Topper*, the court found that the plaintiff had joined the company in the expectation that he would be an active participant in management and that his "expectation" was a necessary component of the corporation's formation. At some point, however, the majority shareholders discharged plaintiff as an employee and removed him as an officer. The court found that "[w]hether the controlling shareholders discharged petitioner for cause or in their good business judgment is irrelevant.... [T]he respondents' actions have severely damaged petitioner's reasonable expectations and constitute a freeze-out of petitioner's interest; consequently, they are deemed to be 'oppressive' within the statutory framework." *Topper v. Park Sheraton Pharmacy, Inc.*, supra at 28, 433 N.Y.S.2d 359. The court reviewed the legislative history of § 1104(a) and found that, by providing for dissolution when majority shareholders have been guilty of "oppressive actions," the Legislature intended to adopt the "reasonable expectation" test which had been set forth by Professor F. Hodge O'Neal in *Oppression of Minority Shareholders* (1975) and Close Corporations, Existing Legislation and Recommended Reform, 33 The Business Lawyer 873 (Jan. 1978).

In *Matter of Beshar, supra*, the court found that the controlling shareholders had excluded the plaintiff from any meaningful participation in the affairs of the corporation and had not declared dividends for almost twenty-five years. It concluded that the petition stated a claim under § 1104(a) by charging "a deliberate effort to freeze-out petitioner from any participation in the actual profits of the corporation." *Id.*

O'Donnel contends that his reasonable expectation as a minority shareholder to share equally in the profits and the management of the corporation have been frustrated by his expulsion. Defendants concede that a reasonable expectation test is appropriate to give content to the statutory term "oppressive actions." They attempt to distinguish *Topper* from the present case, however, on the ground that a minority shareholder's expectations must be judged as of the time of the *formation* of the corporation. Since O'Donnel did not actually become a shareholder at the time of the corporation's formation, but only upon being sold some of Marino's stock a year later, they argue, he had no relevant expectation to share in the benefits and management of the corporation. The argument is without merit. First, nothing in the language of § 1104(a) suggests that its protection is limited to expectations engendered at the time of the creation of the corporation. To the contrary, the partnership analogy informing the interpretation of § 1104, e.g., *Topper v. Park Sheraton Pharmacy, Inc.*, supra at 32–34, 433 N.Y.S.2d 359, suggests that O'Donnel's expectations should be judged as of the time he and Marino became "partners." Second, it is clear from the facts of this case that O'Donnel and Marino had agreed, as of the formation of MRS, that O'Donnel would be a shareholder and that he and Marino would share equally in the profits and the management of the corporation. The failure formally to make O'Donnel a shareholder until April, 1974, merely reflects the informality with which close corporations are frequently run, and the informality which § 1104(a) is intended to remedy. *See Topper v. Park Sheraton Pharmacy, Inc.*, supra at 33, 433 N.Y.S.2d 359. Moreover, regardless of when O'Donnel actually became a shareholder, it was

agreed that he would share equally in the corporation. Accordingly, when he agreed to become, and became, a joint owner with Marino, he reasonably expected to share in the profits and the management of the corporation. These reasonable expectations were frustrated when he began to be excluded from the operations of the corporation in April, 1980, when he was voted out as a director in May, 1980, and when he was removed as an officer in June, 1980.

Defendants next contend that O'Donnel could not have reasonably expected to share equally in the corporation because Marino always owned more shares than O'Donnel. This proposition is without merit. As noted above, throughout the period of joint ownership, Marino and O'Donnel were paid precisely the same salary and enjoyed precisely the same benefits. Moreover, they shared the management responsibilities. In light of the circumstances surrounding the founding of MRS, it was not unreasonable for O'Donnel to expect that the agreement of equality would be honored despite the fact that Marino was formally the majority shareholder.

Finally, defendants argue that O'Donnel was not oppressed but rather had insisted on terms of separation from Marino which were unreasonable and that he was terminated for good cause in light of his expressed intention to compete with the company. This argument, too, is unpersuasive. As noted above, we find that O'Donnel did not begin to compete until he had already been terminated by the defendants and that O'Donnel's statements regarding the possibility that he would compete with the corporation were not taken seriously by Marino or Greenspoon. Rather, these statements must be taken as O'Donnel's frank expression of his bargaining position in the negotiations with Marino. Indeed, at least for a time, Marino and O'Donnel continued to work together harmoniously after O'Donnel stated that he could leave the corporation and compete in the South. These statements therefore may not be relied upon to justify the later exclusion of O'Donnel from the corporation.

Accordingly, O'Donnel is entitled to relief under § 1104(a).

### III.

O'Donnel claims that, since his departure, the directors and officers of MRS have been guilty of wasting and looting corporate assets in selling the New York operation for an insufficient price and in making various investments and pricing decisions which O'Donnel claims were undertaken solely to make it appear that his competition has hurt the company. These claims are without merit. O'Donnel's expert witness' testimony as to the insufficiency of the price secured for the New York operation was successfully impugned by the facts, drawn out on cross-examination and in defendants' testimony, that his opinion was rendered without the knowledge of what assets MRS had retained after the transaction. O'Donnel's other assertions of waste were contradicted by defendants' evidence that each challenged action was taken for a proper corporate purpose. O'Donnel presented insufficient evidence to support these claims of wasting and looting.

### IV.

Defendants contend that O'Donnel is guilty of breaching his fiduciary duties as an officer and director by planning to compete and competing with MRS while he was still employed, and by competing with MRS and appropriating corporate opportunities after he was terminated. We have already found that O'Donnel did not compete with MRS until after he had been terminated on June 11, 1980. Accordingly, defendants' claims relating to alleged competition during O'Donnel's tenure as an officer and director are dismissed.

Defendants' claim with respect to post-termination activity rests on the proposition that O'Donnel breached his fiduciary duties to MRS by accepting the business of a customer who had already deposited its work with CM and thereby appropriating a corporate opportunity of CM. Defendants argue that by inducing Yager to resign from CM, O'Donnel made it impossible for

CM to complete work on reefers which Sea Containers had deposited with CM and that, by undertaking to complete the work, O'Donnel appropriated a corporate opportunity of CM. This argument is unpersuasive. Yager's deposition testimony establishes that Yager was not induced by O'Donnel to leave CM, but was determined to resign, regardless of what O'Donnel did, rather than work for Marino. Moreover, there was no evidence that MRS could not have replaced Yager with another manager in the two weeks after which Yager had given notice. Finally, Anderson of Sea Containers testified that she directed her company's reefers to be transferred from CM to GCS because she trusted Yager to do a good job on the containers. She testified that she was not solicited to transfer that work to GCS. Thus, since Yager was not induced by O'Donnel to leave CM at least until after O'Donnel had been terminated, and the business of Sea Containers was not solicited by O'Donnel or Yager, the issue is whether O'Donnel appropriated a corporate opportunity by accepting the Sea Container business after he had begun GCS with Yager. While we agree with defendants that, under *Abbott Redmont Thinlite Corp. v. Redmont*, 475 F.2d 85 (2d Cir. 1973), the Sea Container business which had already been delivered to CM's premises constituted a "tangible expectancy," and thus a corporate opportunity of CM, we do not agree that, simply by accepting the business when Sea Containers decided to have GCS complete the work, O'Donnel breached his fiduciary duties to MRS. In *Redmont*, it was held that a former employee who competes with his former employer may not "utilize specific information he obtained during his employment to deprive his ex-employer of customers ... or to exploit projects which would have clearly brought profits to [the former employer] but for his competition." *Id.* at 88–89. Here, however, defendants have pointed to no specific information which O'Donnel used to deprive MRS of its customers. The evidence establishes that Sea Containers caused its reefers to be delivered to GCS because it trusted *Yager* to do the job properly. Accordingly, it ap-

pears to be *Yager's* competition with CM, not O'Donnel's which was the crucial factor in the transfer of business. Since there is no claim against Yager in this suit, we need not decide if Yager utilized specific information gained during his employment at CM to deprive CM of the opportunity to complete work on the Sea Container reefers.

■ Finally, O'Donnel conceded that he failed to return company automobiles after his termination. Accordingly, he is liable for their fair rental value for the period during which he refused to return them.

\* \* \*

O'Donnel is entitled to relief under New York Business Law § 1104(a). O'Donnel's derivative claims for waste and looting are dismissed. Defendants' counterclaims are dismissed, except that O'Donnel is liable to MRS for the fair rental value of the automobiles which he failed to return to MRS for the period for which he has possessed them.

The above memorandum constitutes our findings of fact and conclusions of law.

It is so ordered.