NEWTON D. BARTLE, as Trustee in Bankruptcy of Onondaga Operating Corp., et al., Appellants, *v.* HYMAN B. FINKELSTEIN et al., Respondents.

Fourth Department, July 1, 1963.

*Smith & Sovik* (*Laurence Sovik* of counsel), for appellants.

*Conrad & Smith* (*Samuel Rubin* of counsel), for Hyman B. Finkelstein and others, respondents.

*Ferris, Adams & Creidy* (*Albert Adams* of counsel), for Milton Finke, respondent.

GOLDMAN, J. Appellants, a trustee in bankruptcy of Onondaga Operating Corp., hereinafter referred to as "Onondaga", and Blitman, a purported creditor of Onondaga, allege in their complaint seven causes of action against the officers, directors and stockholders of Onondaga and Hotel Abbey Holding Corp., hereinafter referred to as "Abbey", for transfers in fraud of creditors and in violation of section 15 of the Stock Corporation Law and section 60 of the General Corporation Law. The trial court dismissed all seven causes of action. The appeal from the sixth cause of action was withdrawn by stipulation and we shall not concern ourselves with the other four causes of action which

we believe were properly decided by the trial court. This opinion will deal only with the first and seventh causes of action, the dismissal of which we believe was error.

To evaluate properly the merits of the two causes of action which, in our judgment, were substantiated by the proof, it is necessary to give a factual history of the transactions here involved. The two principal parties, who were the dominant personalities in this action, are Hyman B. Finkelstein, who died just before trial, hereinafter referred to as " Finkelstein ", and Milton Finke, hereinafter referred to as " Finke ". In 1955 these two respondents, who were then and thereafter until May 1, 1959, officers and directors, and owners of all of the stock of Abbey, formed Onondaga for the purpose of operating the hotel which had been in existence for many years prior to their acquisition of it. All of the outstanding stock of Abbey and of Onondaga was owned two-thirds by Finkelstein and one-third by Finke until May 1, 1959 when Finke withdrew from both corporations and transferred his stock to Finkelstein who then became the sole owner of all the issued stock of both corporations.

Onondaga operated the hotel, pursuant to a lease starting January, 1956 until June 19, 1959 when an involuntary petition in bankruptcy was filed, which resulted in an adjudication in bankruptcy on July 7, 1959. From the inception of the operation by Onondaga until May 1, 1959 Finke was president and a director of Onondaga and Finkelstein was its treasurer and a director and on May 1, 1959, when Finke withdrew, Finkelstein added the presidency of Onondaga to his other offices.

The operation of the hotel proved unsuccessful from almost the first day and its financial difficulties increased as it continued doing business. Obligations for rent and other accounts payable were rarely paid in full when due and generally creditors received only part payment on outstanding debts. Continuously from September 30, 1958 until the date of bankruptcy Onondaga defaulted in payment of its lease obligations and trade accounts payable mounted daily. Some 148 proofs of claim totalling at least $109,000 were filed in the bankruptcy proceedings. From the beginning of the business until the date of bankruptcy Onondaga never operated at a profit — it was always a deficit operation. Although the trial court made no finding of insolvency it is undisputed that Onondaga was insolvent when the payments alleged in the first and seventh causes of action were made to Abbey. The balance sheet of Onondaga on September 30, 1958 indicated that its current assets totalled $80,588.73 and its current liabilities were $526,619.98, while its total assets, fixed as well as current, were $383,641.95 and its total liabilities

were $531,319.98. There cannot be the slightest doubt that as of September 30, 1958 Onondaga was badly insolvent and any realistic appraisal of its condition, particularly by insiders like Finkelstein and Finke, forecast financial doom for Onondaga.

Exhibits of respondents and appellants, showing schedules of transactions between Abbey and Onondaga (which are the subject of the claims asserted in the first and seventh causes of action), demonstrate that Onondaga paid to Abbey, while unquestionably insolvent, $80,500 for antecedent debts to May 1, 1959 and additional payments of $10,500 to June 5, 1959. In connection with respondents' argument that the loans and payments were revolving trade loans, which will be more fully discussed later, it is significant to observe that from February 24, 1959 to April 20, 1959 Abbey loaned Onondaga $14,000, but that during the period from January 27, 1959 to June 5, 1959 Onondaga paid Abbey $69,000 or $55,000 more than Onondaga had received from Abbey. It must be remembered that during this period when Onondaga was making these substantial payments to Abbey, bearing in mind that the two corporations had identical stockholders and officers, other creditors who had no interest except as trade creditors were being refused payment.

If appellants are to succeed, their claims must be bottomed on Finkelstein and Finke's liability under section 15 of the Stock Corporation Law. Appellants' proof falls short of their claim of misconduct by Onondaga's officers under section 60 of the General Corporation Law, and further does not sustain, as a matter of evidence, the required showing of intent to prefer contained in the provisions of section 15 of the Stock Corporation Law following the first sentence thereof. The liability of Finkelstein and Finke, in our view, is mandated by that part of section 15 which provides that "No corporation which shall have refused to pay any of its notes or other obligations, when due, in lawful money of the United States, nor any of its officers or directors, shall transfer any of its property to any of its officers, directors or stockholders, directly or indirectly, for the payment of any debt, or upon any other consideration than the full value of the property paid in cash." These two respondents cannot escape liability for the payments of Onondaga to Abbey after the insolvency of Onondaga unless these payments were in exchange for " the full value of the property paid in cash ", which clearly they were not.

Respondents urge that the transactions between the two corporations were revolving trade loans and did not in fact create a debtor-creditor relationship. An examination of the exhibits demonstrates beyond doubt that except for the first few trans-

actions, which are not considered by us in arriving at our computations, these were loans made by Abbey, upon which, from time to time, Onondaga made part payment. *Matter of Stern & Co.* (54 F. 2d 478, 480) cited by respondents in support of their position is in no manner controlling. Even if one disregards the fact that the *Stern* case did not deal with a corporation which was wholly owned by the officers and directors of both the paying and receiving corporations, there is no revolving credit situation in the case at bar. No better proof of this can be given than the payments by Abbey of $14,000 over a period when Onondaga was paying Abbey $69,000, as set forth above.

Respondent Abbey contends, with legal support for its position, that it cannot be charged with a preference under the first sentence of section 15 for it was not an officer, director or stockholder of Onondaga. It could, however, be charged with liability under the second sentence of that section, but there it requires proof of intent to prefer Abbey over other creditors of the bankrupt. This was not sufficiently established at trial although it is a close question and it would not be unreasonable to conclude that the mere fact of payments by Onondaga to Abbey, after September 30, 1958 establishes a pattern of preference. However, on this record, we are unwilling to make that determination. Hence, the first and seventh causes of action were properly dismissed as to respondent Abbey.

In order to hold respondents Finkelstein and Finke liable under these two causes of action we must determine that the facts justify the piercing of the corporate veil. We must start with the premise that persons who are officers and all of the stockholders of an insolvent corporation are prohibited from obtaining a preference by preferring another corporation of which they are also officers and the only stockholders (15A Fletcher's Cyclopedia Corporations [1938 Rev.], § 7477, p. 289). The doctrine of piercing the corporate veil is applicable in those cases where to invoke the principle is to prevent fraud, illegality or to achieve equity (*Bartle* v. *Home Owners Cooperative,* 309 N. Y. 103, 106; *International Aircraft Trading Co.* v. *Manufacturers Trust Co.,* 297 N. Y. 285, 292; *Halsted* v. *Globe Ind. Co.,* 258 N. Y. 176, 179; *Jenkins* v. *Moyse,* 254 N. Y. 319, 324). The illegality in the instant case would consist in a violation of section 15 of the Stock Corporation Law and the inequity would result from the dealings of the directors and officers who owned both corporations without regard to the rights of creditors. The assets of a corporation, under settled law, constitute a trust fund for the benefit of creditors (*Matter of Baldwin Trading Corp.,*

8 N Y 2d 144, 147; *Darcy* v. *Brooklyn & N. Y. Ferry Co.*, 196 N. Y. 99; *Stefanzyn* v. *Brooklyn Nat. Bank of N. Y.*, 251 App. Div. 259).

Where a court of equity is seeking to adjust rights between parties it looks at the merits rather than at form and to that end will disregard the fiction of a separate corporate entity where justice requires that it should be done (*People* v. *North Riv. Sugar Refining Co.*, 121 N. Y. 582; *Goss & Co.* v. *Goss*, 147 App. Div. 698, affd. 207 N. Y. 742; *Modlin* v. *Licht*, 224 App. Div. 614, affd. 252 N. Y. 589; 1 Fletcher's Cyclopedia Corporations, § 41, pp. 134–136; 11 N. Y. Jur., § 10, pp. 117–118).

Although the factual situation is not analogous, the language of Mr. Justice Douglas in *Pepper* v. *Litton* (308 U. S. 295) is applicable. There the controlling stockholder of a corporation sued the corporation on accumulated unpaid salary claims, which he attempted to collect only when the corporation was in financial difficulty. The stockholder caused the corporation to confess judgment and used the judgment to delay a creditor; he levied on part of the corporate property and bought it in at a Sheriff's sale for much less than his judgment and then transferred the property to a second " one-man " corporation. He caused the first corporation to go into voluntary bankruptcy in order to avoid payment of the creditor's claim. In holding that the bankruptcy court had the power to disallow either 'as a secured or as an unsecured claim the judgment obtained by the dominant and controlling stockholder of the bankrupt corporation on the alleged salary claims, Mr. Justice Douglas said (pp. 310–311): " Though disallowance of such claims will be ordered where they are fictitious or a sham, these cases do not turn on the existence or non-existence of the debt. Rather they involve simply the question of order of payment. At times equity has ordered disallowance or subordination by disregarding the corporate entity. That is to say, it has treated the debtor-corporation simply as a part of the stockholder's own enterprise, consistently with the course of conduct of the stockholder. But in that situation as well as in the others to which we have referred, a sufficient consideration may be simply the violation of rules of fair play and good conscience by the claimant; a breach of the fiduciary standards of conduct which he owes the corporation, its stockholders and creditors. He who is in such a fiduciary position cannot serve himself first and his *cestuis* second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity

violate the ancient precept against serving two masters. He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly." (Footnote references in this quotation have been omitted.)

It would indeed be difficult to find a fact situation which is more conclusive of self-dealing to the detriment of creditors. Who in fact was Abbey? Who in fact was Onondaga? Both corporations, even to the exact proportion of stockholdings in each, were Finkelstein and Finke. But, urge the respondents, no one has even suggested that we did not lend the money to Onondaga. Are we not, they ask, entitled to the same consideration given to other creditors who may have received payment for their obligations during the same period? The answer seems obvious — these two respondents were gambling to save Onondaga, in which event they would have won substantially more than the repayment of their loans. They took a calculated risk and should not be permitted to bail themselves out by preferential payments indirectly made to themselves when Onondaga paid Abbey. No fiction of corporate existence should be permitted to be used as a shield to prefer themselves to the prejudice of other creditors.

We have determined that all payments which the trial court shall ascertain were made by Onondaga to Abbey " upon any other consideration than the full value of the property paid in cash " between November 12, 1958 and June 5, 1959 were violations of the first sentence of section 15 of the Stock Corporation Law and therefore preferential payments indirectly made to Finkelstein and Finke for which appellants should have judgment. Because of the result reached by the trial court we do not have any computations or findings of the amounts of the payments which were preferential. Unfortunately the complaint does not give us much assistance in resolving the confusion. The first cause of action demands $61,000, included in which is a payment to Abbey on April 7, 1959 of $9,500. Exhibits 27, 30 and 33 which contain the most accurate schedules of the transactions between Onondaga and Abbey contain no reference to this item but there does appear to be a payment of $10,000 on that date. Although the first and seventh causes of action both deal with payments from Onondaga to Abbey, the arbitrary cut-off date for the first cause of action as of April 7, 1959 seems to be without justification. In the seventh cause of action the demand

for $30,000 is for some equally unexplained reason divided between $14,000 for violation of section 15 of the Stock Corporation Law and $16,000 for defrauding creditors, which could only be recovered under section 60 of the General Corporation Law. As stated, we find the proof insufficient to sustain a violation of section 60. We have difficulty in finding any distinction between the character of the two groups of payment for they both seem to be payments in violation of section 15 of the Stock Corporation Law. Furthermore, there is no proof to support the alleged payment of $500 on April 7, 1959 and there is serious doubt as to the nature of the payment of $2,500 on April 30, 1959. The only evidence produced would seem, in the present state of the record, to confirm respondents' claim that Abbey received a check for this amount, cashed it and immediately returned the $2,500 to Onondaga for payroll. Other examples of the confused state of the evidence could be supplied but it should be clear at this point that the obligation must rest with the trial court, when further proof is taken, pursuant to our decision, to determine the exact amount to which appellants are entitled by reason of the preferential payments involved in the transactions between Onondaga and Abbey. It is for this reason that the matter must be remanded to the trial court for a determination of the amount of the judgments. It must, of course, be borne in mind that any preferential payments made before May 1, 1959 should be charged to Finkelstein and Finke jointly and that any amounts found due appellants after that date should be the sole responsibility of Finkelstein.

The judgment should be modified by reversing the dismissal of the first and seventh causes of action for the purpose of determining damages only and otherwise the judgment should be affirmed.

WILLIAMS, P. J., BASTOW, McCLUSKY and HENRY, JJ., concur.

Judgment unanimously modified by reversing on the law and facts the dismissal of the first and seventh causes of action and a partial new trial granted as to those two causes of action for the purpose of determining damages only and otherwise judgment affirmed, without costs of this appeal to any party. Certain findings of fact disapproved and reversed and new findings made.