In re TELEMARK MANAGEMENT COMPANY, INC., The Telemark Company, Inc., Telemark Land Company, Inc., Historyland, Incorporated, and Thaw, Inc., Debtors.

Lawrence KAISER, as Trustee of the Estate of Telemark Management Company, Inc.; The Telemark Company, Inc.; Telemark Land Company, Inc.; Historyland, Incorporated; and Thaw, Inc., Plaintiff,

v.

Sheila WISE and Anthony Wise, d/b/a Anthony Wise Enterprises, d/b/a AWE, and American Classic Competition, Defendants.

Bankruptcy Nos. EF7–81–00747, EF7–81–00748, EF7–81–00749 and EF7–81–00750.

Adv. No. 84–0170–7.

United States Bankruptcy Court, W.D. Wisconsin.

Oct. 3, 1984.

Stephen H. Cohen, Patricia J. St. Peter and Sherri Hallerman Gould, Minneapolis, Minn., for plaintiff.

Sheila Wise, Anthony Wise, defendants, pro se.

FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATING TO THE OWNERSHIP OF CERTAIN PROPERTY

WILLIAM H. FRAWLEY, Bankruptcy Judge.

Plaintiff Lawrence J. Kaiser, Trustee, by Robins, Zelle, Larson & Kaplan, having filed an Amended Complaint claiming, *inter alia,* equitable ownership of certain property; and Defendants Sheila Wise, Anthony Wise and American Classic Competition, on their own behalf, having filed a Joint Answer; and hearings having been held from time to time; and an expedited trial having been held; and the Plaintiff appearing by Attorneys Stephen H. Cohen, Patricia J. St. Peter and Sherri Hallerman Gould; and the Defendants appearing by Anthony Wise; the Court, being fully advised in the premises, FINDS THAT:

1. The primary subject of this portion of the above-captioned adversary proceeding is certain items of property relating to the Debtors' businesses, to-wit:

(A) The American Birkebeiner and The Lumberjack World Championships (Special Events),

(B) certain items of personal property,[1]

(C) certain real property underlying Historyland, Inc., operations, and

(D) a liquor license.[2]

There is no significant dispute regarding the evidentiary facts.

2. *The Wise Interests.* Prior to the conversion of the above-captioned bankruptcy proceedings from Chapter 11 (reorganization) to Chapter 7 (liquidation) of the Bankruptcy Code, Defendants Sheila and Anthony Wise—individually and through wholly-owned corporations—owned and operated resort and tourist properties in northwest Wisconsin (the Wise Interests).[3]

3. The Wise Interests began as a ski hill and rope tow in 1947; and, primarily due to the vision and promotion of Anthony Wise, became a multi-million dollar business.

4. Some or all of the Wises' wholly-owned corporations are the Debtors in this matter (Telemark Enterprises). At all times relevant to this adversary proceeding Anthony Wise served as an officer and director of the Telemark Enterprises' companies—exercising complete dominion and control over the Debtors, including management decisions concerning all phases of Telemark Enterprises' operations. Mr. Wise testified that he was, in addition, self-employed and acted on his own behalf regarding the individually claimed items.

5. Evidence at trial presented three perspectives of the Wise Interests: operational, financial and formal.

6. The Wise Interests were operated as an integrated family business. Each day's receipts were deposited into a common fund and disbursed to meet the Wise Interests' most pressing obligations. The Wises would draw from the common fund for personal and business related expenses and, in addition, monies would be transferred from the common fund to the Wises' personal checking account. Although earning a salary, Anthony Wise did not receive a regular check for said earnings.

7. Complete financial records were maintained for the Wise Interests. Common fund receipts and disbursements were

---

**1.** "Personal property" is used here to mean "personalty" (as opposed to realty), not "personally owned property".

**2.** A liquor license is "property" in bankruptcy proceedings. *In re 'Addis,* 40 B.R. 908, 909 (Bankr.W.D.Wis.1984). *Cf. Manos v. City of Green Bay,* 372 F.Supp. 40 (E.D.Wis.1974) *Escheat, Inc., v. Pierstorft,* 354 F.Supp. 1120, 1124 (E.D.Wis.1973) (constitutional due process requirements apply at license renewal hearings).

**3.** Sheila and Anthony Wise are wife and husband. Hereinafter, any reference to either spouse's individual property interest shall include any interest the other spouse may have by virtue of the marital relationship.

credited to certain "profit centers" (e.g., hotel, food, ski hill) to determine the profitability of distinct segments of the Wise Interests' operation. A separate ledger was maintained for the Defendants' draws —Mr. Wise's salary was entered on this ledger as a credit toward the draws. From the time the ledger was first kept until the time of the bankruptcy proceeding conversion, the Defendants' draws exceeded Mr. Wise's salary by a total of $567,800. Mr. Wise treated these cash advances as "loans". (Anthony Wise testified that the profit generated by the individually claimed liquor license exceeded both the losses from other individually claimed profit centers and the Wises' draw.)

8. Generally, there was no consistent effort to formally distinguish the Wises' individual and corporate assets. For example:

(A) The 1955 incorporating papers of The Telemark Company did not list property being exchanged for stock.

(B) While the April 30, 1980, bankruptcy petition of Debtor Historyland, Inc., showed a leasehold interest in real property held by Anthony Wise, Telemark Enterprises' Amended Consolidated Plan of Reorganization (filed October 28, 1982) did not list the lease as an assumed executory contract and the accompanying Amended Consolidated Disclosure Statement appears to include the real property in the assets of Historyland, Inc.

9. *Special Events.* The American Birkebeiner (Birke), the premier cross-country ski race in the United States, and the Lumberjack World Championships (LJWC), a nationally broadcast event, are two of the Wise Interests' profit centers. The names "American Birkebeiner" and "Lumberjack World Championships" are unique and recognized as events tied to Telemark Enterprises properties.

10. Both events are related to, and operated under the auspices of, Telemark Enterprises' companies. The companies reported past and future income and expenses from the events on their financial statements and tax returns. The record in this bankruptcy proceeding contains frequent references to the Birke and to the LJWC as profit centers within the ambit of Telemark Enterprises—there is nothing in the record to suggest that, prior to the conversion of this proceeding to Chapter 7 of the Bankruptcy Code, any claim was made that the events were owned by the Defendants.

11. Advertising and broadcast rights to the LJWC were sold by Anthony Wise as an officer of Historyland, Inc. The Lumberjack Bowl, scene of the LJWC, was depreciated on Historyland, Inc., tax returns.

12. There was no evidence that Telemark Enterprises formally leased the special events from Mr. Wise. Mr. Wise testified that he franchised the Birke and the LJWC to Telemark Enterprises. In addition, evidence was offered to show that the Birke could not be successfully operated without either the expertise of Anthony Wise or the expertise of his daughter, Frances Wise.

13. *Personal Property.* Three hundred and five items of disputed personalty property were tagged by the United States Marshal in July of 1984.[4]

14. The 305 tagged items appear to be assets used in Telemark Enterprise business operations. (Untagged gifts from foreign countries—such as plaques, awards and certificates—claimed by Mr. Wise during this litigation, are his personal property.)

15. The Defendants produced evidence that the Wise Interests obtained some of the items in the name of Anthony Wise.

16. At one time at least one of the items was insured in the name of Anthony Wise. At one time Anthony Wise, individually,

---

4. Some of the items are claimed by the Wises on behalf of third parties. *See, e.g.,* Defendants' Exhibit 5 (eight exhibit cases loaned to Historyland, Inc., by the State Historical Society of Wisconsin). The Court assumes that the Trustee will return such items to the rightful owners upon proper documentation or other proof.

granted a security interest in one of the items to the Summit National Bank.

17. In some years, Anthony Wise would claim individual ownership of bar fixtures on liquor license applications; in other years, he would claim that ownership was vested in a Telemark Enterprises company. Bar inventory was included as a Telemark Enterprises asset in the Debtors' Amended Consolidated Disclosure Statement (filed Nov. 1, 1982).

18. In all other respects, the items appear to have been held out as Telemark Enterprises assets. (Anthony Wise testified that it was unnecessary to distinguish individually-owned items because he was willing to "mortgage" those items in the interest of the business operations.)

19. There was no evidence that Telemark Enterprises formally leased the items from Mr. Wise. Mr. Wise testified that he franchised the personal property to Telemark Enterprises.

20. Immediately following the conversion of this proceeding to Chapter 7 of the Bankruptcy Code, Anthony Wise removed a total of $12,367.16 from the Telemark complex.

21. *Real Property.* Historyland, Inc., currently operates on, *inter alia,* four parcels of real property obtained by Anthony Wise in his own name, after Historyland was incorporated.

22. Two Wise Interest profit centers operate on the disputed property: the Lumberjack World Championships and the Pancake House. Because these profit centers are Telemark Enterprises property, *see* Paragraphs 52 & 53 *infra* (LJWC), the use of the land is required by Telemark Enterprises. (From time to time the Wises and Historyland jointly mortgaged all of the property underlying Historyland.)

23. Two parcels, formerly owned by the Wise Brothers Land Company (WBLC), were obtained in a transaction in which Anthony Wise transferred his one-half interest in WBLC to the other WBLC shareholder. Two parcels, formerly owned by a "stranger" (an unrelated third party), were obtained in a transaction in which Anthony Wise, individually, borrowed the funds used to make the purchase. Monies to pay this debt came from the Wise Interests' common fund.

24. Historyland, Inc., operated on some or all of the disputed parcels at the time of the transfers set forth above. For example, the Historyland Pancake House operated on the land obtained from a stranger.

25. The April 30, 1980, Historyland, Inc., bankruptcy petition "Statement of Executory Contracts" listed a lease "from Anthony Wise for real property located in Hayward, Wisconsin, and used as Historyland". However, no such lease is listed as an assumed executory contract in the Telemark Enterprises Amended Consolidated Plan of Reorganization (filed October 28, 1982).

26. There is no evidence of a formal lease between Anthony Wise and Historyland, Inc., or of any rental payments from the corporation to Mr. Wise. Anthony Wise testified that he franchised the real property to Historyland, Inc.

27. On various Telemark Enterprises financial statements, including Telemark Enterprises' Amended Consolidated Disclosure Statement (filed November 1, 1982), the disputed property was listed as a corporate asset. (Anthony Wise testified that it was unnecessary to distinguish individually-owned land because he was willing to "mortgage" the land in the interest of the business operations.) Similarly, the Trustee produced an Anthony Wise personal financial statement which contains no reference to the disputed land.

28. *Liquor License.* In 1955 Anthony Wise purchased the Wigwam Bar and obtained one of a limited number of Cable, Wisconsin, liquor licenses. Mr. Wise obtained the license with the intent to use it at or near the Telemark operation. At about the same time, Mr. Wise caused The Telemark Company to be incorporated.

29. The liquor license was not used until 1957, when it was "moved" and used at Telemark. The license has been used to

sell alcoholic beverages at the Telemark complex from 1957 to the present. The availability of alcohol on the Telemark premises is essential to the success of Telemark Enterprises operations. All license fees and expenses associated with the liquor business were paid out of the Wise Interests' common fund.

30. In 1972 title to the license was transferred from Mr. Wise to one of the Telemark Enterprises Companies. The transfer was made to avoid perceived legal limitations on the use of the license at Telemark. During the period that Telemark Enterprises held the license there was no change in the way the liquor profit center was operated or in the way liquor proceeds were used and reported.

31. In 1975 title to the license was returned to Mr. Wise. The license was returned because the stock of the Telemark Enterprises company holding the license was pledged to a stranger and the Wises were concerned that the license might be in jeopardy. (Apparently, the 1972 perception of legal limitations on the use of the license was erroneous.)

32. In 1977 the Wise Interests established a distinct entity, AWE, which paid liquor bills. AWE was formed in response to tightened liquor licensing requirements. Proceeds from liquor sales continued to flow into the Wise Interests' common fund and AWE was, in turn, financed from the common fund.

33. On January 1, 1978, the Wises, Debtor Telemark Management Company (TMC) and the Telemark Lodge Owners Association entered into a lease and management agreement in which, *inter alia*, the parties declared that Mr. Wise owned the liquor license and Mr. Wise leased a portion of the lodge for liquor sales.

34. In its April 30, 1981, bankruptcy petition TMC claimed an August, 1980, executory contract with the Telemark Lodge Owners Association—no mention was made in regard to the Wises.

35. Throughout the remainder of 1981 and 1982 Telemark Enterprises and its major secured creditors negotiated a plan of reorganization. The secured creditors originally asked that Mr. Wise transfer the liquor license to TMC and that the " 'lease' or other arrangement" between Mr. Wise and TMC be terminated. Defendants' Exhibit 1. However, the secured creditors ultimately settled for an agreement that the liquor license "will always be available" at Telemark. Defendants' Exhibit 2.

36. The Telemark Enterprises Amended Consolidated Plan of Reorganization (filed Oct. 28, 1982) provides for the assumption of a contract between the Wises, doing business as AWE, and Telemark Enterprises for the lease of certain premises for the sale of liquor. Section VII Paragraph J of the plan provides that the Wise liquor license "shall continue to be available at Telemark by lease or other mutually acceptable agreement" in the event of a plan default.

37. On May 17, 1984, the Telemark Enterprises bankruptcy proceeding was converted from Chapter 11 (reorganization) to Chapter 7 (liquidation) of the Bankruptcy Code, 41 B.R. 501.

38. The 1983–84 Wise liquor license was to expire on June 30, 1984. Lawrence J. Kaiser, the Interim Trustee of Telemark Enterprises, and Anthony Wise were unable to reach a mutually acceptable agreement regarding the use of the Wise liquor license and both parties applied for a 1984–85 license.

39. On June 6, 1984, a week before a scheduled public licensing hearing, the Cable Town Board (the liquor licensing authority) met in closed session and discussed the situation at Telemark. The result was a June 7, 1984, "Notice to Intent of Non-Renewal of Liquor License" to Anthony Wise. Mr. Wise testified at trial that he received the Notice within a day or two of its issuance.

40. On June 11, 1984, a hearing was held before this Court to consider, *inter alia*, the competing liquor license applications. The Court and the parties expressed concern that the license would "slip through the cracks" if both applications

were disputed—Mr. Wise did not inform the Court of the June 7 Notice in open court or in chambers.[5] The result of the June 11 hearing was an agreement that the Wise application would be initially offered to the Town Board, that the Trustee would not oppose the Wise application, that—in the event the Wise application was not granted—Anthony Wise would not oppose the Trustee's application and that this Court would make a subsequent determination of the equitable ownership of the license. In addition, it was agreed that proceeds from liquor sales would be placed in an escrow account pending resolution of the ownership question. *See Telemark Management Company, Inc. v. Anthony Wise,* Adv. 84-0144 (Bankr.W.D.Wis.) (transcript of June 11 hearing filed as docket number 10).

41. On June 14, 1984, prior to the Cable Town Board meeting, the Trustee and the counsel for the Town Board were erroneously informed that the intent of this Court's June 11 Order was that the liquor license be issued in the name of Anthony Wise. This was a misinterpretation of the June 11 Order. Nevertheless, based upon the misunderstanding, the Trustee agreed to request that the Town Board issue the license to Wise.

42. At the June 14 Town Meeting the agreement was accepted by the Board. Bernard Radloff, Chairman of the Board, commented: "The Board feels we want this license to continue at Telemark so its business can continue to operate ..." Plaintiff's Exhibit 38. Other evidence produced by the Trustee demonstrates that the Cable Town Board is—and has been—primarily concerned that a liquor license be issued for use at the Telemark complex.

43. Two of the three board members subsequently testified that they agreed to the renewal of the Wise liquor license—contrary to their June 7 Notice—because of their understanding of this Court's June 11 Order.

44. On various Telemark financial statements, including Telemark Enterprises' Amended Consolidated Disclosure Statement (filed November 1, 1982), past and future income and cash flow generated by the use of the liquor license were reported as corporate assets. Said assets are vital to the operation of the Telemark Enterprises operations. *See* Paragraph 7 *supra* (liquor income and profit supports other operations).

45. Although the liquor license is listed as an asset on personal financial statements related to the Wises' tax returns, Plaintiff's Exhibit 70, no report of income, loss or expenses relating to beverage sales appears on said returns prior to 1983.

46. Debtor Telemark Management Company, Inc., listed debts owed to alcoholic beverage suppliers on schedules filed with its April 30, 1981, petition for relief.

47. *Other Findings.* The Telemark Enterprises' confirmed plan provides for payments to approximately 650 creditors divided into 36 classes of claims and interests. Class DD includes approximately 193 creditors with claims of less than $1,000 each—including, *e.g.,* Meeting Selector Corp. of Los Angeles, California (owed $100 for services rendered in December of 1980) and James Griffin of Chicago, Illinois (owed $301.78 for services rendered in August of 1980).

48. The Court notes Mr. Wise's assertion that the Telemark Enterprises' bankruptcy estate has diminished to the point that the only creditors who will participate in a distribution of the Debtors' assets are the major secured lenders.

49. Other than the facts set forth above, there is no evidence to corroborate Anthony Wise's testimony that he intended to and, in fact, did franchise, loan or contribute the disputed properties to Telemark Enterprises in return for the costs of main-

5. Had the Court known of the Notice, there may have been no need for the Court consideration of well over two hours as to said application. This secreting and suppressing of said Town Board determination was clearly intentional on Mr. Wise's part, and he is not in this Court of Equity with clean hands.

taining said properties: there are no written contracts, corporate minutes or other corporate records relating to any such agreements. Nor is there any independent evidence to support a finding that any franchise, loan or contribution—if made—was terminable at will. Any of the alleged agreements between the Defendants and Telemark Enterprises—if made—were made by Mr. Wise on his own behalf and, simultaneously, on behalf of the Debtors; the only other party to acquiesce to the agreements was Defendant Sheila Wise.

## Discussion

50. The corporate form of business operation encourages investment by limiting individual liability. Accordingly, courts generally recognize and respect the distinction between corporate and individual property. *See* C. Van Swearingen, *Fletcher Cyclopedia of the Law of Private Corporations* sec. 14 (1983).[6]

█ 51. However, exceptions are made to the general rule in situations where justice and equity require. *Id.* Three such situations are:

(A) When corporate and individual business interests are so intertwined that the corporation is indistinguishable from the individual, the alter ego doctrine operates to treat the assets of both as corporate property. *See id.* at secs. 41.10 & 41.50. (Even commentators who question the application of the alter ego doctrine in some cases (*e.g.*, where the only evidence that the corporation was the alter ego of the shareholder is a lack of such formalities as the board of directors meetings) agree that the doctrine is properly applied when "intermingled personal and corporate assets may disappear into the

personal coffers of the shareholder to the detriment of corporate creditors." R. Hamilton, *The Law of Corporations* sec. 6.4 (1980).)

(B) When individual property is represented to creditors as corporate property and creditors rely on that representation, the doctrine of equitable estoppel operates to prevent the person making the original representation from making a different representation to the detriment of the creditors. *See generally* 28 Am.Jur.2d *Estoppel and Waiver* secs. 27 *et seq.* (1966).

(C) When an officer or director,[7] employed by a corporation to pursue its interests, obtains or develops assets which otherwise would be obtained or developed by the corporation, the corporate opportunity doctrine applies to permit the corporation to recover those assets on the terms which were available to the officer or director. *See Fletcher*, Paragraph 50, *supra*, at secs. 861 *et seq.*

█ 52. *Special Events.* It is clear to this Court that the Defendants have *no* claim to the Birke[8] or to the LJWC. *See Central Ry. Signal Co. v. Longden*, 194 F.2d 310 (7th Cir.1952) (at 319: "'A director or officer of a corporation can not use corporate assets to acquire, finance or develop his own individual business project or venture and insist that ... the venture ... [is] his own property.'" (citation omitted)).

53. Even if the Defendants had a colorable claim to the special events, the corporate claim would prevail under *any* of the three doctrines set forth above.

54. *Personal Property.* The evidence of corporate purchase and use of most of the 305 items of personal property is overwhelming.

---

6. Because the resolution of this adversary proceeding is based upon the application of basic legal doctrines, citation is made to legal reference works which, in turn, contain citations to much of the relevant case law.

7. This rule also applies to corporate promoters and to majority stockholders. 18 Am.Jur.2d *Corporations* secs. 109, 135 & 502 (1965).

8. That no one outside of the Wise family is capable of operating the Birke in its current form, if true, supports Paragraph 3 of this Decision but is simply irrelevant to the question of whether the event itself is a corporate asset.

■ 55. The Defendants' evidence that some of the items were paid for with personal checks (from an account funded by the business operation, Paragraph 6 *supra*) and that some of the items were, at one time, insured or collateralized in the name of Anthony Wise, is not enough to overcome the fact that these items were held out as corporate assets on other occasions.

56. Finally, even assuming that some of the items were obtained by the Defendants, there is no reason why Telemark Enterprises could not have obtained these items on its own behalf.

57. In short, all three of the doctrines discussed above support Telemark Enterprises' claim to the personal property.

58. It is self-evident that the $12,367.16 removed from the Telemark complex is corporate property.

59. *Real Property.* Because title to the real property is in Mr. Wise's name, the operation of the alter ego doctrine is significantly weakened. As the Defendants are equitably estopped from claiming the real property, Paragraph 61 *infra*, this Court need not decide whether the lack of rental payments, the conflicting ownership representations and, in the case of the two non-WBLC parcels, the payment of the purchase price from the Wise Interests' common fund, is enough to sustain the corporate claim under the alter ego doctrine.

■ 60. The fact that title to real property is involved does not prevent the operation of the doctrine of equitable estoppel. *Kirk v. Hamilton*, 102 U.S. (12 Otto) 68, 76–78, 26 L.Ed. 79 (1880). While a major sophisticated lender would have a difficult burden in this case to establish that it was misled by any representation which conflicted with the title of record, the Trustee represents all unsecured creditors—including, for example, those listed in

Paragraph 47 of this Decision.[9] *See* 11 U.S.C. sec. 702 (unsecured creditors may elect trustee), *see also Heyman v. Exchange Nat. Bank of Chicago*, 615 F.2d 1190, 1194 (7th Cir.1980) (trustee under Bankruptcy Act of 1898).

■ 61. Mr. Wise repeatedly portrayed all of the land underlying Historyland as corporate property—in the case of the Amended Consolidated Disclosure Statement, there is a direct and clear statement made to all creditors. The doctrine of equitable estoppel applies.

■ 62. The corporate opportunity doctrine supports a conclusion of corporate ownership of the disputed land—at least in regard to the two parcels beneath the Pancake House which were obtained from a stranger.

■ 63. *Liquor License.* The liquor license held by Anthony Wise has been used exclusively at the Telemark complex, proceeds from the sale of alcoholic beverages have been applied to Telemark Enterprises operations with no credit to the Wise's personal draw account and the license has been freely transferred between Mr. Wise and Telemark Enterprise corporations—in other words, there has been no real distinction between Anthony Wise and Telemark Enterprises and, under the alter ego doctrine, the license should be treated as corporate property.

64. The holding out of liquor income and profit as Telemark Enterprise assets is evidence to suggest that Mr. Wise should be equitably estopped from claiming an interest in the liquor license.

65. The Defendants have advanced no corporate business reason why the liquor license could not have been obtained by the Telemark Company in 1955; the Defendants have advanced no corporate business reason why the liquor license could not

---

**9.** When it is clear that there can be no recovery for the unsecured creditors, the Trustee is obligated to abandon the matter. *In re SMS, Inc.,* 15 B.R. 496, 500–502. However, there is no evidence to support the Defendants' assertion that this is such a case. When it appears that a distribution to the unsecured creditors is possible, the trustee "has a duty to realize the maximum from the estate of the bankrupt for distribution to the creditors." *See In re Benny,* 29 B.R. 754, 760 (N.D.Cal.1983).

have been transferred within the Telemark Enterprises family of companies in 1975; and the Defendants have advanced no corporate business reason why the liquor license could not have been transferred to TMC in 1982. Anthony Wise obtained and retained the liquor license used at the Telemark complex by the usurpation of corporate opportunities.

66. *Defenses.* The Defendants have advanced several theories to support their claims to the disputed properties. Most of these theories are dealt with in detail above. The remarks which follow are directed to Mr. Wise's emotional closing argument.

67. Anthony Wise has devoted 37 years of his life to Telemark. His contribution to the people and economy of northwest Wisconsin has been significant and lasting. Mr. Wise's considerable talents ensure that, whatever endeavor Mr. Wise chooses to pursue in the future, that contribution will continue.

68. As for the present, the duty of the Court is to determine the facts and apply the law to those facts. Mr. Wise believed that he had structured his affairs to protect a small "estate" from corporate creditors— the law is otherwise. This Court has no choice but to enter the following Conclusions of Law.

## CONCLUSIONS OF LAW

1. Anthony Wise is indebted to Telemark Enterprises in an amount of $567,800.

2. The American Birkebeiner is an asset of Telemark Enterprises.

3. The Lumberjack World Championship is an asset of Telemark Enterprises.

4. The disputed items of personal property are assets of Telemark Enterprises.

5. All of the real property underlying Historyland is an asset of Telemark Enterprises.

6. The Cable, Wisconsin, liquor license held by Anthony Wise is an asset of Telemark Enterprises.

7. The Defendants are constructive trustees of Telemark Enterprises to the extent that they possess or retain title to the aforesaid Telemark Enterprise assets.

8. Judgment should issue in favor of Telemark Enterprises and against Anthony Wise for $567,800.

9. The American Birkebeiner should be, and the same hereby is, declared an asset of Telemark Enterprises which has the exclusive right
(a) to the use of the names "American Birkebeiner", "Birkebeiner" and "Birke";
(b) to promote, operate and receive all revenues from said event, and
(c) to have the Defendants turn over forthwith all funds they have received for the 1985 Birkebeiner.

10. The Lumberjack World Championships should be, and the same hereby is, declared an asset of Telemark Enterprises, which has the exclusive right
(a) to the use of the names "Lumberjack World Championships" and "Lumberjack Days"; and
(b) to promote, operate and receive all revenues from said event.

11. The 305 tagged items of personal property and the $12,367.16 removed from the Telemark complex should be, and the same hereby are, declared assets of Telemark Enterprises, which is entitled to have all such items turned over forthwith by the Defendant Constructive Trustees.

12. All of the real property beneath the Historyland operation should be, and the same hereby is, declared an asset of Telemark Enterprises; and title to such parcels as are held by Constructive Trustee Anthony Wise is hereby vested in Telemark Enterprises and divested from Anthony Wise and Sheila Wise.

13. The Cable, Wisconsin, liquor license held by Anthony Wise should be, and the same hereby is, declared an asset of Telemark Enterprises, which is entitled to have all escrowed funds relating to said license turned over forthwith by Constructive Trustee Anthony Wise; and said license is hereby vested in Telemark Enterprises and

divested from Anthony Wise and Sheila Wise.

Let Judgment enter accordingly.