In re GORDON CAR & TRUCK
RENTAL, INC., Debtor.

GORDON CAR & TRUCK RENTAL,
INC., Plaintiff,

v.

Sheldon A. GORDON, Jr., Richard W.
Gordon, and Estate of Sheldon A.
Gordon, Sr., Defendants.

AMC LEASING CORPORATION and
American Motors Leasing
Corporation, Plaintiffs,

v.

GORDON CAR & TRUCK RENTAL,
INC., Sheldon A. Gordon, Jr., Richard
W. Gordon and Estate of Sheldon A.
Gordon, Sr., Defendants.

Bankruptcy No. 85–00709.
Adv. No. 85–0035.

United States Bankruptcy Court,
N.D. New York.

June 25, 1986.

See also 59 B.R. 956.

Brett W. Martin, Utica, N.Y., for debtor.

Menter, Rudin & Trivelpiece, P.C. (Louis J. Testa, of counsel), Albany, N.Y., for AMC Leasing and American Motors Leasing Corp.

Charles Swan, Elmira, N.Y., for Estate of Sheldon.

Sheldon A. Gordon, Jr., pro se.

Richard W. Gordon, pro se.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

Gordon Car and Truck Rental, Inc. ("Debtor") has commenced the present adversary proceeding requesting the declaratory judgment of the Court respecting the rights, if any, of Debtor in certain franchise or license agreements. Original defendants consisted of Sheldon A. Gordon, Jr. ("S.A. Gordon"), Richard W. Gordon ("R.W. Gordon") and the Estate of Sheldon A. Gordon, Sr. ("Estate"). Sheldon A. Gordon, Sr. was the father of S.A. Gordon and R.W. Gordon.

AMC Leasing Corporation and American Motors Leasing Corporation (collectively "AMC") moved to intervene as plaintiffs, with the Court granting the request.

The Court has jurisdiction pursuant to 28 U.S.C. § 157 and § 1334, as well as Federal Bankruptcy Rule of Procedure 7001(2) & (9) ("FBRP"). On March 31, 1986, a hearing was held with regard to the issues raised with the parties requested to thereafter submit proposed findings of fact and conclusions of law. The following constitute the findings of the Court pursuant to FBRP 7052.

## FINDINGS OF FACT

1. On August 28, 1985, the Debtor filed its voluntary petition in bankruptcy for relief under Chapter 11 of Title 11 of the United States Code ("Code").

2. The Debtor is a "debtor-in-possession" as defined in Code § 1101, and has continued operation of its business under Code §§ 1107 and 1108.

3. The Debtor was incorporated in the State of New York on December 28, 1959, with the filing of the certificate of incorporation with the Department of State of New York.

4. The primary business of Debtor is the rental of cars and trucks at various locations throughout the State of New York. One such location was in the Broome County Airport in Binghamton, New York.

5. On April 21, 1960, Sheldon A. Gordon, Sr., S.A. Gordon, and R.W. Gordon executed an exclusive automobile license agreement with Avis, Inc.; this license was assigned by Avis, Inc. to Avis-Rent-a-Car System, Inc. on May 12, 1965, and concerned business operations within the City of Binghamton, New York.

6. On January 1, 1964, Sheldon A. Gordon, Sr., S.A. Gordon, and R.W. Gordon, d/b/a Gordon Car and Truck Rental, Inc. executed an exclusive truck license agreement with Avis, Inc.; this license was assigned by Avis, Inc. to Avis-Rent-a-Car System, Inc. ("Avis") on May 12, 1965, and concerned operations within the City of Binghamton, New York. Together with the automobile license agreement identified above, these licenses were known as the "Binghamton licenses".

7. At the time the Binghamton licenses were signed by Sheldon A. Gordon, Sr., S.A. Gordon, and R.W. Gordon, the three

individuals were officers and sole shareholders of the Debtor.

8. On April 4, 1978, Sheldon A. Gordon, Sr. executed a statement of ownership with respect to the Binghamton automobile license. The statement represented to Avis that this license was owned by a partnership, consisting of Sheldon A. Gordon, Sr., S.A. Gordon, and R.W. Gordon as partners. In further contradictory terms, Sheldon A. Gordon, Sr. stated these three individuals were each the owner of 33⅓% of the outstanding capital stock of a corporation which owned the licenses.

9. No separate partnership agreement existed between the individual signors of the Binghamton licenses. No certificate of conducting business as partners was filed in the Broome County Clerk's office, nor any other New York State county pursuant to N.Y.Gen.Bus.Law § 130 (McKinney 1968).

10. No assignment or transfer of the Binghamton licenses was made by the individual signors to the Debtor.

11. Sheldon A. Gordon, Sr. was President of the Debtor from the date of incorporation until his death some time in June, 1983. S.A. Gordon was employed by Debtor since its incorporation, acting as Vice-President thereof until elected as President in August, 1985. R.W. Gordon managed the Debtor's Binghamton operations under the licenses from 1960 to 1985, and acted as President of Debtor from June, 1983 until August, 1985.

12. Debtor operated under the Binghamton licenses immediately after execution thereof. No separate written agreement existed between the individual signors of the Binghamton licenses and Debtor authorizing the latter to operate the same.

13. With regard to the Binghamton automobile license, Avis was paid the sum of $2,800.00. Testimony adduced that a portion of this sum was paid out of either a corporate account maintained by Black and White Taxi Corp. (an entity operated by Sheldon A. Gordon, Sr.), or out of Debtor's "regular" account. S.A. Gordon testified he contributed $2,000.00 towards the purchase price, with no personal sums contributed by Sheldon A. Gordon, Sr. or R.W. Gordon. R.W. Gordon believed Sheldon A. Gordon, Sr. utilized $1,000.00 each from insurance policies of S.A. Gordon and R.W. Gordon, respectively, for purchase of the Binghamton automobile license.

14. The three individuals did not maintain a separate checking account or other bank accounts as partners; all revenues generated from operation of the Binghamton licenses were deposited in the Debtor's corporate accounts.

15. The Debtor filed all tax returns for the Binghamton licenses in its own name. No tax returns were filed by the individual signors as partners. All taxes relating to the Binghamton licenses were paid by the Debtor. No separate federal tax identification number for operation of the Binghamton licenses was obtained by any of the individual signors, or by a partnership comprised of the individuals. The individual signors did not report profits/losses pertaining to operation of the Binghamton licenses on personal tax returns.

16. All employees operating the Binghamton licenses were hired by the Debtor, and were provided wages and benefits by that entity.

17. The Debtor provided the rental vehicles used in the operation of the Binghamton licenses.

18. The Debtor provided insurance for the operation of the Binghamton licenses.

19. All license or similar fees due Avis for the Binghamton licenses were paid by Debtor; at no time were such fees paid by the individual signors.

20. The lease for occupancy of the premises at the Broome County Airport used for operation of the Binghamton licenses was executed by Debtor.

21. Sheldon A. Gordon, Sr., S.A. Gordon, and R.W. Gordon received salaries paid by Debtor; no royalties or the like for corporate use of the franchise agreements were paid to them in an individual capacity.

22. On February 4, 1983, R.W. Gordon filed a voluntary petition in bankruptcy under Chapter 7 of the Code (Case No. 83–10184, Northern District of New York, Albany division). Schedules and Statement of Affairs filed therein are devoid of reference to interests in any partnerships or license agreements; no personal debts due Avis are scheduled.

23. The Binghamton automobile and truck license agreements, at paragraphs 13 and 11 therein, respectively, provide in effect that they may not be transferred, conveyed, or assigned without the consent of Avis.

24. Attorney Charles Swan ("Swan") is a co-executor of the Estate. On the Estate's behalf, Swan agreed to sell both Binghamton licenses to Christopher Paticopolus, Jeanne Koutoufaris, and Helen Underwood ("Purchasers") for the total sum of $100,000.00. The terms of sale were set forth in a letter to Swan dated January 31, 1986 from Attorney Harvey M. Lifset ("Lifset"), Purchasers' attorney.

25. At the time of the hearing, at least two other letters had passed between Swan and Lifset which set forth the status of the proposed sale of the Binghamton licenses; a letter dated February 4, 1986 from Swan to Lifset, and a letter dated February 7, 1986 from Lifset to Swan.

26. The Purchasers have paid to Broome County, New York, (as a part of the $100,000.00 purchase price for the Binghamton licenses,) debts of the Debtor incurred under the lease agreement. $10,-932.22 has been paid on arrears accruing under Debtor's lease; $6,666.66 has been paid for use of the property for the months of December, 1985 and January, 1986; and $2,000.00 has been paid Broome County for attorneys' fees, time and travel expended in enforcing certain lease rights against Debtor.

27. The sums set forth above were paid directly by the Purchasers to Broome County; the sums did not "pass through" the hands of any of the three individual signors of the license agreements, or their representatives, prior to payment to the County.

28. The Binghamton licenses are currently operated by Purchasers.

29. Swan has received $10,000.00 from the Purchasers as part of the proposed sale, and holds that sum in an escrow account.

30. The Court entered an order on February 21, 1986, restraining the Estate, S.A. Gordon, and R.W. Gordon from receiving further sums from the purchase of the Binghamton licenses, or disposing of any monies previously received in connection with any sale or transfer of these licenses. The parties have consented to the continued imposition of the temporary restraining order.

Additionally, the Court notes the Debtor's ownership of Avis license agreements for the cities of Utica, Elmira, Corning, and Ithaca, New York. These licenses or franchises, while not involved in the present dispute, are held by Debtor in its own right.

## ARGUMENTS

Debtor argues application of the "corporate opportunity doctrine", which provides for imposition of a constructive trust in favor of a corporation when its officers or directors acquire property in which the corporation had a "tangible" expectancy. *See, Guth v. Loft, Inc.*, 23 Del.Ch. 255, 5 A.2d 503 (Del.1939); *Poling Transp. Corp. v. A & P Tanker Corp.*, 84 A.D.2d 796, 443 N.Y.S.2d 895 (1981) (*"Poling Transp. Corp."*). Debtor states a "line of business test" is applicable to determine whether the opportunity acquired by the officer is related to the operations of the corporation. *Rosenblum v. Judson Eng'g Corp.*, 99 N.H. 267, 109 A.2d 558 (1954).

AMC argues that defendants are equitably estopped from asserting title and ownership of the Binghamton licenses. All indicia and manifestations of ownership were assumed by Debtor, without protest from the individual signors, with the former then operating and conducting business with

third parties (i.e. AMC) as apparent owner. *See, Matter of Pubs, Inc.,* 618 F.2d 432 (7th Cir.1980); *Moore v. Metropolitan Nat. Bank,* 55 N.Y. 41 (1873); *Porter v. Wertz,* 68 A.D.2d 141, 416 N.Y.S.2d 254 (1979), *aff'd,* 53 N.Y.2d 696, 439 N.Y.S.2d 105, 421 N.E.2d 500 (1981); 21 N.Y.Jur. *Estoppel, Ratification, and Waiver,* § 42 (1961).

The Estate argues that due solely to its own efforts, the offer of $100,000.00 was received, for the Debtor had previously rejected the lease with Broome County which would have rendered the Binghamton licenses valueless. The Estate, requesting application of the Court's equitable powers, seeks to avoid "enriching" the Debtor via "transfer" of the Binghamton licenses to it, as it was Debtor which had ". . . foreclosed any value to these franchises by obtaining permission from this Court to terminate its lease . . .". Finally, the Estate argues it should be declared owner of the license agreements, as Sheldon A. Gordon, Sr. was " . . . presumably the major contributor towards the acquisition of these franchises."

## CONCLUSIONS OF LAW

Nearly fifty years ago, the New York Court of Appeals established the principles of fiduciary conduct:

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been

the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. *Wendt v. Fischer,* 243 N.Y. 439 [154 N.E. 303] (1926). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545 (1928); *see, e.g., Albert A. Volk Co. v. Fleschner Bros, Inc.,* 298 N.Y. 717, 83 N.E.2d 15 (1948); *Burg v. Horn,* 380 F.2d 897, 902 (2d Cir.1967) (dissenting opinion).

At the relevant times of acquiring both Binghamton licenses, Sheldon A. Gordon, Sr., S.A. Gordon, and R.W. Gordon were officers and sole shareholders of Debtor. As such, where the interests of Debtor were concerned, each was bound to conduct themselves at the higher level of behavior enunciated above, no exceptions.

▪ Should a corporate officer acquire for him or herself property in which the corporation had a "tangible expectancy", the corporation may then insist that title was acquired for its benefit, and may require the fiduciary to transfer the property to it at his or her cost. *Poling Transp. Corp.,* 84 A.D.2d at 796–97, 443 N.Y.S.2d 895; *Abbott Redmont Thinlite Corp. v. Redmont,* 475 F.2d 85 (2d Cir.1973); *New York Trust Co. v. American Realty Co.,* 244 N.Y. 209, 155 N.E. 102 (1926) ("*American Realty Co.*"); *Guth v. Loft, supra.* The underlying rationale of the "rule of corporate opportunity" is that officers and directors may not "use their position of trust and confidence to further their private interest."[1] *Poling Transp. Corp.,* 84 A.D.2d at 797, 443 N.Y.S.2d 895. At the very least, the corporate opportunity doc-

---

**1.** Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation.... The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated....

If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit....

The rule . . . is merely one of the manifestations of the general rule that demands of an officer or director the utmost good faith in his relation to the corporation which he represents. *Guth v. Loft, Inc., supra* 23 Del.Ch. at 270–71, 5

trine is a rule of disclosure requiring the fiduciary to pass along information to his or her corporation where appropriate. *In re Tufts Electronics, Inc.,* 746 F.2d 915, 917 (1st Cir.1984). Should diversion of corporate opportunity be established, a constructive trust is impressed in favor of the corporation upon the property acquired. *Poling Transp.; Burg v. Horn, supra; Abbott Redmont Thinlite Corp. v. Redmont, supra; Guth v. Loft, Inc., supra.*

While authorities speak of imposition of a constructive trust on the corporation's behalf, certain language in *American Realty Co.,* and *Poling Transp. Corp.,* suggest the officer may be compelled to transfer the property acquired to his or her corporation, at cost, if particular findings be made. *American Realty,* 244 N.Y. at 219, 155 N.E. 102, *Poling Transp. Corp.,* 84 A.D.2d at 797–7, 443 N.Y.S.2d 895. These findings include: 1) The officer or director had knowledge that the corporation contemplated or considered purchase of the property; 2) Such knowledge induced the fiduciary to purchase the property; 3) Acquisition was made with intent to divert into his or her coffers the prospective benefit which the corporation expected to acquire; 4) Purchase was made when duty to the corporation required the fiduciary to act on its behalf.

■ At a minimum, a constructive trust is imposed when the diverted corporate opportunity falls within a corporation's "line of business". Certain commentators have stated that *any* opportunity within a corporation's "line of business" is a corporate opportunity. *See, e.g.* Note, *Corporate Opportunity,* 74 Harv.L.Rev. 765, 768–69 (1961); Note, *A Survey of Corporate Opportunity,* 45 Geo.L.J. 99, 100–01 (1956). The Second Circuit has narrowed this broad generalization by holding " ... that under New York law a court must determine in each case, by considering the relationship between the director and the corporation, whether a duty to offer the corporation all opportunities within its 'line of business' is fairly to be implied." *Burg v. Horn, supra,* at 900.

A.2d at 510; *Abbott Redmont Thinlite Corp. v.*

■ At the outset, it was noted the corporation must have some "tangible expectancy" in the opportunity usurped by its fiduciary, with "degree of likelihood of realization from the opportunity ... the key to whether an expectancy is tangible." *Abbott Redmont Thinline Corp. v. Redmont, supra,* at 89. Also noted, the doctrine of corporate opportunity is, in essence, a rule of disclosure, placing the burden upon the officer or director to inform the corporation of opportunities within its "line of business". When the evidence adduced at the hearing is viewed with the above considerations in mind, the Court does not believe it sufficient to sustain a finding that the individuals diverted an opportunity of Debtor by acquiring the Binghamton licenses in their own names.

■ Little testimony concerned the Debtor's attempts to secure such license agreements. At best, any inference of a "lost" corporate opportunity arises from the enviable hindsight of twenty-five years. Testimony did not establish that but for the Gordons' individual taking of the Binghamton licenses, the same would have been awarded to or secured by Debtor. *See, Abbott Redmont Thinline Corp. v. Redmont, supra* at 89. The corporate opportunity doctrine is also inapplicable for the individuals' action in purchasing the Binghamton licenses necessarily involved the knowledge and assent of the Debtor—the three Gordons, by virtue of their sole stock ownership and involvement as officers, were the Debtor. Even assuming that acquisition of the Binghamton licenses was an opportunity properly belonging to Debtor, the individuals cannot be accused of withholding or concealing information from *themselves* as sole shareholders and officers of the Debtor. *In re Tufts Electronics, Inc., supra* at 917.

The Court believes resolution turns not upon application of the corporate opportunity doctrine, but upon application of an equally basic equitable doctrine, that of "alter ego". "When corporate and individual business interests are so intertwined that the corporation is indistinguishable

*Redmont, supra,* at 88 n. 3.

from the individual, the alter ego doctrine operates to treat the assets of both as corporate property." *In re Telemark Mana. Co.*, 43 B.R. 579, 586 (Bankr.W.D. Wis.1984), *aff'd*, 47 B.R. 1013 (1985), *citing*, C. Van Swearingen, *Fletcher Cyclopedia of the Law of Private Corporations*, §§ 41.10 and 41.50 (1983); *City Bank Farmers Trust Co. v. Macfadden*, 13 A.D.2d 395, 216 N.Y.S.2d 215 (N.Y.App. Div.1961), *reargument denied*, 14 A.D.2d 671, 219 N.Y.S.2d 943, *aff'd*, 12 N.Y.2d 1035, 239 N.Y.S.2d 680, 190 N.E.2d 24 (1963), *cert. denied*, 375 U.S. 823, 84 S.Ct. 63, 11 L.Ed.2d 56 (1963). Application of the alter ego doctrine is an exception to the general rule of court recognition and respect for the distinction between corporate and individual property. *Fletcher Cyclopedia of the Law of Private Corporations*, *supra* at § 14; *Bartle v. Finkelstein*, 19 A.D.2d 256, 241 N.Y.S.2d 655 (1963). "Where a court of equity is seeking to adjust rights between parties it looks at the merits rather than at form and to that end will disregard the fiction of a separate corporate entity where justice requires that it should be done." *Id.*, at 261, 241 N.Y.S.2d 655; *accord, People v. North River Sugar Refining Co.*, 121 N.Y. 582, 24 N.E. 1099 (1890); *Goss & Co. v. Goss*, 147 A.D. 698, 702–03, 132 N.Y.S. 76 (N.Y.App.Div.1911) *aff'd*, 207 N.Y. 742, 101 N.E. 1099 (1913).

When the "alter ego" doctrine is applied, equally applicable is the doctrine of equitable estoppel. When individual property is represented to creditors as corporate property, and creditors rely on that representation, the person making the initial representation is estopped from making a different representation to the detriment of creditors. *See generally*, 28 Am.Jur.2d *Estoppel and Waiver* §§ 27 et seq. (1966); 21 N.Y.Jur. *Estoppel, Ratification, and Waiver*, § 15 et seq. (1961); *In re Telemark Mana. Co.*, *supra*, at 586; *Bank of Mauston v. Marachowsky*, 258 Wis. 599, 46 N.W.2d 863 (1951) (corporate officer is estopped from asserting personal ownership of that which he held out as an asset of the corporation over the years).

Under either the "alter ego" doctrine or that of equitable estoppel, the property in question is to be treated as an asset of the Debtor, with the initial acquiring party (herein, the individual Gordons) receiving credit for the original investment. *In re Telemark Mana. Co.*, *supra*, at 587–8. Thus, constructive trustees Estate, S.A. Gordon, and R.W. Gordon should be and are to be divested from ownership of the Binghamton licenses, with title to the same vested in the Debtor. The evidence overwhelmingly shows the individuals' complete lack of personal responsibility and liability for the Binghamton licenses beyond that of initial acquisition in their own names as part of an illusory partnership. With respect to the Binghamton truck license, the individuals even acknowledged they were "doing business as" the Debtor corporation. For over twenty-five years, the individuals saw fit to have Debtor operate the Binghamton licenses as a corporate asset. In all facets of operation—from employment and compensation of employees, to acquisition of insurance; from receipt and deposit of earnings in Debtor accounts, to Debtor payment of liabilities; from Debtor responsibility for tax returns and tax payments, to Debtor acquisition of the vehicles utilized in the actual leasing—the individuals never asserted an individual or partnership interest in the Binghamton licenses.

The evidence indicates the Binghamton automobile license was purchased for $2,800.00, with the Binghamton truck license reciting consideration of $400.00. As relates to the Binghamton automobile license, S.A. Gordon stated he paid $2,000.00, with neither his father or brother contributing anything. R.W. Gordon stated his father used $1,000.00 from the former's insurance policy for the initial purchase; he believed his father did the same on his brother's (S.A. Gordon) behalf, for a total personal contribution of $2,000.00. Testimony was also had that the balance of the initial purchase price came from a "corporate" account. The individuals bear the burden of establishing their individual contributions towards the acquisition of the Binghamton licenses. *In re Telemark Mana. Co.*, *supra*. Without more than the above, the Court determines

R.W. Gordon and S.A. Gordon are entitled to claims against the Debtor's estate in the amount of $1,000.00 each, the figure representing the investment made on their behalf by Sheldon A. Gordon, Sr. *Id.* at 1018. In the absence of evidence to the contrary, the balance of the $3,200.00 total purchase price is presumed to have been paid with corporate sums. No evidence having been introduced to show personal payment by the deceased, Sheldon A. Gordon, Sr., none may be presumed.

As a consequence of the foregoing, it is ORDERED:

1. The Avis automobile and truck license agreements for the City of Binghamton, New York should be, and the same hereby are, declared an asset of Gordon Car & Truck Rental, Inc.; said license agreements are hereby vested in Gordon Car & Truck Rental, Inc. and divested from Sheldon A. Gordon, Jr., Richard W. Gordon, and the Estate of Sheldon A. Gordon, Sr.

2. Sheldon A. Gordon, Jr. and Richard W. Gordon are each allowed a claim of $1,000.00 against the Debtor's estate.